**WEGOLAND LTD., Michael Roth, executor of the estate of Howard Weiner, Donna Rutili Roazen, Plaintiffs–Appellants,**

v.

**NYNEX CORP., Peter L. Haynes, New England Telephone & Telegraph Co., New York Telephone Company, NYNEX Business Information Systems, NYNEX Credit Co., NYNEX Information Solutions Group, Inc., William G. Burns, William C. Ferguson, NYNEX International Co., NYNEX Material Enterprises Co., NYNEX Mobile Communications Co., NYNEX Properties Co., NYNEX Systems Marketing, Paul C. O'Brien, Delbert C. Staley, Paul D. Covill, Frederick Salerno, NYNEX Service Co., Defendants–Appellees.**

Nos. 603, 604, Dockets 93–7565, 93–7589.

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1994.

Decided May 20, 1994.

Kenneth A. Jacobsen, Haverford, PA (Michael D. Donovan, Chimicles, Burt, Jacobsen & McNew, Haverford, PA, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, of counsel), for plaintiffs-appellants.

Guy Miller Struve, New York City (James D. Liss, Nancy B. Ludmerer, Vincent T. Chang, Davis Polk & Wardwell, New York City, Raymond F. Burke, Gerald E. Murray, Richard H. Wagner, White Plains, NY, of counsel), for defendants-appellees.

Before: WALKER and JACOBS, Circuit Judges, and DALY, District Judge.[*]

WALKER, Circuit Judge:

Plaintiff ratepayers appeal from a judgment of the United States District Court for the Southern District of New York (Kimba

[*] The Honorable T.F. Gilroy Daly, United States District Judge for the District of Connecticut, sitting by designation.

M. Wood, *Judge*) dismissing their two putative class action suits brought pursuant to the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and associated state statutes and causes of action. Judge Wood ruled that the plaintiffs' actions were barred by the filed rate doctrine. For substantially the reasons articulated in Judge Wood's thorough and commendable opinion reported at 806 F.Supp. 1112 (S.D.N.Y.1992), we affirm.

## BACKGROUND

Plaintiffs filed two nearly identical complaints in this matter, which name as defendants NYNEX, New England Telephone and Telegraph Co. ("NETel"), New York Telephone Co. ("NYTel"), numerous subsidiaries, and individual directors and executives of these corporate entities (collectively "NYNEX"). Plaintiffs are three purported NYNEX ratepayers. The facts necessary to dispose of this appeal are succinctly stated in the district court's opinion:

> The complaints allege that NYTel and NETel gave regulatory agencies and consumers misleading financial information to support the inflated rates they requested. More particularly, plaintiffs allege a scheme in which certain unregulated subsidiaries of NYNEX sold products and services to NYTel and NETel at inflated prices. NYTel and NETel then used those prices to justify inflated rates, resulting in high profits to the NYNEX corporate family, which profited by extracting higher rates from ratepayers, but did not suffer from the higher "cost" of products and services because these extra costs inured to the benefit of members of the corporate family. The net effect, the complaints allege, was that the ratepayers and the regulatory agencies were misled into believing that certain higher rates were justifiable, and the NYNEX corporate family was able to enjoy inflated profits as a result of its misrepresentations.

*Wegoland, Ltd. v. NYNEX Corp.*, 806 F.Supp. 1112, 1113 (S.D.N.Y.1992). The district court referred this matter to Chief Magistrate Judge Nina Gershon, who issued a Report and Recommendation recommending that four of the plaintiffs' seven claims be dismissed. These dismissals were not contested and are thus not before us. As for the remaining three claims, two RICO claims and one state claim, the Chief Magistrate Judge rejected the defendants' argument that the claims were barred by the filed rate doctrine. The Chief Magistrate Judge's recommendation relied primarily on the Eleventh Circuit's ruling in *Taffet v. Southern Co.*, 930 F.2d 847 (11th Cir.1991) ("*Taffet I*"), which was the only appellate decision directly addressing this issue and which held that the filed rate doctrine did not bar RICO claims by ratepayers against utilities.

After the Chief Magistrate Judge issued her recommendation, the Eleventh Circuit, sitting *en banc*, unanimously reversed itself, ruling that the filed rate doctrine does bar RICO claims by ratepayers against utilities. *Taffet v. Southern Co.*, 967 F.2d 1483 (11th Cir.) (*en banc*) ("*Taffet II*"), *cert. denied*, —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992). Also in the intervening period between the Chief Magistrate Judge's recommendation and Judge Wood's ruling, the Eighth Circuit applied the filed rate doctrine to bar a suit in similar circumstances. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992).

In her thoughtful opinion, Judge Wood analyzed the history and purposes of the filed rate doctrine. Agreeing with the analyses in *Taffet II* and *H.J. Inc.*, she concluded that the filed rate doctrine barred the plaintiffs' actions, and accordingly she dismissed the complaints in their entirety. This appeal followed.

## DISCUSSION

■ The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable. Simply stated, the doctrine holds that any "filed rate"—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers. In her opinion, Judge Wood carefully explained the history and rationale of the filed

rate doctrine. *See Wegoland,* 806 F.Supp. at 1113–16. We summarize briefly.

One of the earliest applications of what has become known as the filed rate doctrine came in *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In *Keogh,* the plaintiff alleged a conspiracy to fix freight transportation rates at an unnaturally high level and asked for damages to the extent he had to pay inflated rates as a result of the conspiracy. Assuming the plaintiff's conspiracy allegations were true, Justice Brandeis writing for the Court held that the complaint still had to be dismissed because the rates had been filed with the Interstate Commerce Commission and deemed reasonable by that body. Justice Brandeis articulated several reasons for dismissing the complaint. Among them, he noted that the legal rights between a regulated industry and its customers with respect to rates are controlled by and limited to the rates filed with and approved by the appropriate regulatory agency, and that any attempt to reassess the reasonableness of rates would require the judiciary to "reconstitut[e] the whole rate structure" of the industry. He also explained that any retroactive relief would lead to discrimination in rates in that a victorious plaintiff would end up paying less than similarly situated non-suing customers. *Id.* at 163–64, 43 S.Ct. at 49–50.

Since *Keogh,* these two corresponding interests, one concerned with potential "discrimination" in rates as between ratepayers and the other concerned with the "justiciability" of determining reasonable rates, have turned up in Supreme Court decisions discussing the filed rate doctrine. For example, in *Maislin Industries, U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), the Court emphasized the nondiscrimination strand of this rationale when discussing the policies behind strict adherence to the filed rate doctrine. *Id.* at 126–28, 110 S.Ct. at 2765–67. Likewise, in *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (*"Arkla"*), the Court explained that allowing individual ratepayers to attack the filed rate "would undermine the congression-al scheme of uniform rate regulation." *Id.* at 579, 101 S.Ct. at 2931.

In other instances, the Court is concerned that an attack on the filed rate would unnecessarily enmesh the courts in the rate-making process. For example, in *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), the Court stressed the difficulty for courts "to determine what the reasonable rates during the past should have been" and explained that the "abstract" notion of reasonableness is best left a "function of the Commission." *Id.* at 251, 71 S.Ct. at 695. Although not referring to the filed rate doctrine or the *Keogh* decision by name, Justice Jackson maintained that a plaintiff "can claim no rate as a legal right that is other than the filed rate," and that a court "can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Id.* at 251–52, 71 S.Ct. at 695. More recently, in *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Court endorsed the district court's dismissal of the plaintiff's antitrust complaint seeking treble damages under the Sherman Antitrust Act measured by the difference between the artificially high rate actually filed and the "reasonable" rate absent the fraudulent conspiracy. The Court reaffirmed *Keogh* and its application to the case before it, one in which the district court had spoken of the "attendant complications" in calculating damages because the court would have to determine a "hypothetical" reasonable rate in order to determine the difference from the rate actually paid, and stated that "rate determinations are a matter for the ICC and not for the court." *See* 596 F.Supp. 153, 156 (W.D.N.Y.1984).

Drawing from the *Keogh* decision and these subsequent cases, Judge Wood pointed out that "two companion principles lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, and second, that courts are not institutionally well suited to engage in retroactive rate setting." *Wegoland,* 806 F.Supp. at 1115.

■ Plaintiffs do not, nor could they, quarrel with the general applicability of the filed rate doctrine. Instead, they argue that there should be an exception to the filed rate doctrine when there are allegations of fraud upon the regulatory agency. Yet, apart from the *Taffet I* ruling, which was unanimously overturned *en banc,* every court that has considered the plaintiffs' argument has rejected the notion that there is a fraud exception to the filed rate doctrine. *See Taffet II,* 967 F.2d at 1494–95; *H.J. Inc.,* 954 F.2d at 489; *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,* 847 F.Supp. 281, 291 (D.Conn. 1994) (Cabranes, J.); *Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp.,* 805 F.Supp. 1277, 1295 (D.S.C.1992), *aff'd without opinion,* 998 F.2d 1009 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993); *Cullum v. Arkla, Inc.,* 797 F.Supp. 725, 728–29 (E.D.Ark. 1992), *aff'd without opinion,* 994 F.2d 842 (8th Cir.1993); *Hilling v. Northern States Power Co.,* No. 3–90 CIV 418, 1990 WL 597044, slip op. at 5 (D.Minn. Dec. 12, 1990). Furthermore, the Supreme Court has ruled that the filed rate doctrine acts to bar state causes of action. *See Arkla,* 453 U.S. at 584, 101 S.Ct. at 2933–34. Similarly, courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies. *See Taffet II,* 967 F.2d at 1494; *H.J. Inc.,* 954 F.2d at 494; *Sun City,* at 289; *Wegoland,* 806 F.Supp. at 1115.

In rejecting the plaintiffs' argument on this point, Judge Wood stated that creating a fraud exception would be both out of step with guiding Supreme Court caselaw, which has applied the filed rate doctrine in the face of allegations of fraud on the regulators, as well as contrary to the policies behind the doctrine. We agree.

The Supreme Court in *Square D* considered an alleged conspiracy to submit fraudulently inflated rates to the regulating agency. The Court in *Square D* did not hesitate to apply the filed rate doctrine and gave no intimation that there is an exception for fraud on the regulatory agency. Indeed, applying a general exception for fraud on the regulators would be inconsistent with the line of Supreme Court cases from *Keogh* to *Square D* which developed the filed rate doctrine "precisely for actions alleging a type of fraud on a regulatory agency." *Wegoland,* 806 F.Supp. at 1118.

We note that five years prior to *Square D,* the Court "save[d] for another day the question of whether the filed rate doctrine applies in the face of fraudulent conduct." *See Arkla,* 453 U.S. at 583 n. 13, 101 S.Ct. at 2933 n. 13. The plaintiffs make the point that the Court in *Square D* made no mention of the fact that it seemed to be resolving that open question. But on closer examination, there is an explanation for the Court's silence.

In *Arkla,* a plaintiff utility company had a contract with the defendant-buyer that entitled it to charge higher rates in special circumstances. The utility alleged that the defendant fraudulently failed to notify the utility of the occurrence of these special circumstances, thus preventing it from filing the higher rates with the regulators. The utility further argued that the defendant's fraudulent omission, which kept the utility from filing the higher rate in the first place, estopped it from asserting as a defense the filed rate doctrine. The Court rejected as unsupported by the record plaintiff's allegations of fraud; however, it reserved deciding the narrow legal question, which the district court accurately described as "whether a person's fraudulent failure to notify a seller of conditions triggering a contractual entitlement to a higher rate, thereby preventing the seller from filing a higher rate, estops that person from using the filed rate doctrine in an action against it for the higher rate." *Wegoland,* 806 F.Supp. at 1118 n. 4. Thus, we agree with the district court that the question reserved by the *Arkla* Court was actually a much "narrower question than whether there should be a general exception to the filed rate doctrine for fraudulent conduct." *Id.*

■ Apart from its incompatibility with Supreme Court precedent, plaintiffs' proposed fraud exception is also inconsistent with the strong policies behind the filed rate doctrine. The doctrine is designed to insulate from challenge the filed rate deemed reasonable by the regulatory agency. Con-

gress and state legislatures establish regulatory agencies in part to ensure that rates charged by generally monopolistic and oligopolistic industries are reasonable. This regime protects consumers while fostering stability. The regulatory agencies are deeply familiar with the workings of the regulated industry and utilize this special expertise in evaluating the reasonableness of rates. The agencies' experience and investigative capacity make them well-equipped to discern from an entity's submissions what costs are reasonable and in turn what rates are reasonable in light of these costs.

If courts were licensed to enter this process under the guise of ferreting out fraud in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system. For only by determining what would be a reasonable rate absent the fraud could a court determine the extent of the damages. And it is this judicial determination of a reasonable rate that the filed rate doctrine forbids.

As compared with the expertise of regulating agencies, courts do not approach the same level of institutional competence to ascertain reasonable rates. Regulators employ their peculiar expertise to consider the whole picture regarding the reasonableness of a proposed rate. They make hundreds if not thousands of discretionary decisions about the submitted costs and ultimately arrive at the approved filed rate. Courts are simply ill-suited to systematically second guess the regulators' decisions and overlay their own resolution. Indeed, as Judge Wood perceptively noted, application of the filed rate doctrine is even more appropriate in the RICO context of alleged fraud on the agency (where "regulatory bodies are particularly well suited to determining whether utility costs borne within a corporate family are reasonable," *id.* at 1122) than in the antitrust context (where regulators are unlikely to have much special knowledge as to the existence of illegal conspiracies among competitors), and it is in the antitrust context that the Supreme Court has consistently applied the filed rate doctrine. *See, e.g., Square D,*

476 U.S. at 418–19, 106 S.Ct. at 1927–28; *Keogh,* 260 U.S. at 161–62, 43 S.Ct. at 49.

The plaintiffs respond that courts would not be required to determine a "reasonable" rate, but rather would only have to decide what damages arose from the fraud, a task courts routinely undertake. However, the two are hopelessly intertwined: "The fact that the remedy sought can be characterized as *damages for fraud* does not negate the fact that the court would be determining the reasonableness of rates," *Wegoland,* 806 F.Supp. at 1119, and that "any attempt to determine what part of the rate previously deemed reasonable was a result of the fraudulent acts would require determining what rate would have been deemed reasonable absent the fraudulent acts, and then finding the difference between the two." *Id.* at 1121.

Apart from the institutional competency concern, allowing courts to become enmeshed in the rate-making process would undermine our current regulatory regime, which is designed to be self-policing. Individual ratepayers are unlikely to have any special knowledge of the alleged wrongdoing that would make it advantageous to have private enforcement through the RICO or antitrust provisions. By contrast, regulators who are intimately familiar with the industry are best situated to discover when regulated entities engage in fraud on the agency and to remedy the wrongdoing when the specter of fraud arises. Indeed, that is precisely what has happened in this case, where the regulators in every state affected by NYNEX's alleged fraud have initiated administrative hearings to investigate the charges and issue appropriate remedies to benefit the ratepayers. *See Wegoland,* 806 F.Supp. at 1120–21. Apart from participating in the political process and filing complaints with the regulatory agencies, individual ratepayers simply have no role in attacking the reasonableness of filed rates. Nor is there room for judicial intervention in such a case.

Furthermore, application of the filed rate doctrine prevents discrimination in rates paid by consumers because victorious plaintiffs would wind up paying less than non-suing ratepayers. *See Keogh,* 260 U.S. at 163–64, 43 S.Ct. at 49–50. Plaintiffs respond that the

class action nature of this suit eliminates any potential discrimination, and thus the filed rate doctrine should not apply. While not specifically raised in the district court, the importance of this purely legal issue warrants our attention. *See Austin v. Healey,* 5 F.3d 598, 601 (2d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1192, 127 L.Ed.2d 542 (1994). To be sure, the concerns for discrimination are substantially alleviated in this putative class action. *See, e.g., Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 760 F.2d 1347, 1352 (2d Cir.1985) (Friendly, J.), *aff'd,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *Gelb v. American Tel. & Tel. Co.,* 813 F.Supp. 1022, 1028 (S.D.N.Y. 1993). However, the class action nature of the proceeding in no way affects the important concerns of agency authority, justiciability, and institutional competence previously described. To the contrary, use of the class action to attack the rate-making process tends to frustrate these legitimate interests and might end up costing the consumers even more in litigation expenses. *See, e.g., Taffet II,* 967 F.2d at 1492 (explaining that application of the filed rate doctrine forecloses "strike suits that would be brought as eager lawyers, using the class action vehicle, circumvent the states' rate-making mechanisms—all at the expense of the consumers"). Just as important, court-ordered rate reductions potentially raise the cost of capital (and impede access to equity and bond markets) for capital-intensive utilities, and thereby affect the company and all of its future customers in ways that courts cannot afterwards undo. Moreover, the Supreme Court in *Square D* rejected the invitation of Judge Friendly and the Justice Department to overrule *Keogh* based upon the advent of various procedural developments to avoid discrimination in rates, like the class action. *Square D,* 476 U.S. at 423, 106 S.Ct. at 1930. Because most of the animating policies behind the filed rate doctrine are not diminished in the class action context, we hold that the filed rate doctrine applies whether or not plaintiffs are suing for a class.

Finally, we note that the filed rate doctrine does not leave regulated industries immune from suit under the RICO or antitrust statutes. While individual ratepayers are pre-

cluded from challenging the reasonableness of the rates, the proper government officials remain free to pursue this avenue in appropriate circumstances. *See, e.g., Sun City,* at 290–91.

In conclusion, because a fraud exception to the filed rate doctrine is both contrary to guiding Supreme Court precedent and important regulatory policies, we hold that there is no fraud exception to the filed rate doctrine that would save this suit from dismissal.

As a final point, we note that the district court correctly discerned a tension between the applicability of the filed rate doctrine and this Court's ruling in *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990) ("*LILCO*"). In *LILCO,* we held that RICO is applicable to public utilities and examined the merits of a claim brought by individual ratepayers. *Id.* at 1305–08. The district court understandably was concerned that its ruling would contravene *LILCO* by immunizing utilities from RICO suits brought by ratepayers. The court therefore labored to distinguish the facts of this case from those in *LILCO* and pointed out that the filed rate doctrine was never raised in the *LILCO* opinion. *See Wegoland,* 806 F.Supp. at 1122–24.

We conclude that *LILCO* erects no barrier in this Circuit to the application of the filed rate doctrine to RICO suits brought by ratepayers against utilities. Since we had no occasion to consider the filed rate doctrine in *LILCO* because it was not brought to the panel's attention, the absence of such a discussion can by no means be construed as an implicit rejection of the filed rate doctrine. Accordingly, the *LILCO* decision does not alter the outcome in this case.

## CONCLUSION

We have carefully considered the remainder of the arguments proffered by the parties and find them to be without merit. For the forgoing reasons, we affirm the district court's judgment dismissing the plaintiffs' actions as barred by the filed rate doctrine.