OPINION OF THE COURT
Allan L. Winick, J.
Petition pursuant to CPLR article 78 for a judgment annulling the respondent Long Island Power Authority’s (LIPA) determination dated August 21, 1997, which ratified the definitive agreements between it and Long Island Lighting Company (LILCO) and accepted conditions imposed by the Public Authority Control Board (PACE) established by resolution dated July 16, 1997 is denied and the proceeding is dismissed.
Motion by intervenor-respondent Nassau County Legislature for an order pursuant to CPLR 7804 (f) dismissing the petition is denied.
Petitioners herein, the County of Suffolk and the Initiative For Competitive Energy, a coalition of business groups, civic associations, customer groups and labor unions in the LILCO service area, challenge the respondent LIPA’s August 21, 1997 determination which accepted conditions imposed by the PACE in approving definitive agreements reached by LIPA and respondent LILCO in June 1996 and ratified those agreements.
The respondent LIPA, a publicly owned power authority designed to replace Long Island’s investor-owned utility, is a creature of statute created by the Legislature in 1986 through the enactment of Public Authorities Law § 1020-a et seq. (the LIPA Act.)
In section 1020-a of the Public Authorities Law, the Legislature very specifically articulated its reasons for enacting the LIPA Act. It found that the “[cjonstantly escalating and excessive costs of electricity” in LILCO’s service area “pose a serious threat to the economic well-being, health and safety of the residents of and the commerce and industry in the service area”. (Public Authorities Law § 1020-a.) It further found that there was a lack of confidence that LILCO could meet the area’s electric needs in a “reliable, efficient and economic manner” and that commerce and industry were being deterred and perhaps even driven out of the LILCO service area due to excessive costs and lack of confidence. (Public Authories Law § 1020-a.) The Legislature declared that “a situation threatening the economy, health and safety exists in the service area” and as a response to the crisis, created LIPA, anticipating *213 lower rates and a more efficient, reliable and economic supply of electricity. (Public Authorities Law § 1020-a.) As the Court of Appeals stated in Matter of Citizens For An Orderly Energy Policy v Cuomo (78 NY2d 398, 414), “the recurring and unavoidable theme reflected in the legislative history is that the intended sine qua non objective of the Act was to give LIPA the authority to save ratepayers money by controlling and reducing utility costs”.
LIPA was therefore vested with very broad powers (Public Authorities Law §§ 1020-f, 1020-g, 1020-h), including the power to acquire “all or any part” of LXLCO’s securities or assets through negotiated agreements, tender offers or by eminent domain (Public Authorities Law § 1020-h [2]), so long as LIPA’s Board determines “in its sole discretion based upon such engineering, financial and legal data, studies and opinions as it may deem appropriate, that the rates projected to be charged after such acquisition and for such reasonable period of time as the board may determine will not be higher than the rates projected to be charged by LILCO during such period if such acquisition had not occurred” (Public Authorities Law § 1020-h [2] [emphasis added]).
LIPA has the authority “[t]o make and execute agreements, contracts and other instruments necessary or convenient in the exercise of the powers and functions of the authority * * * including contracts with any person, firm, corporation, municipality, state agency or other entity”. (Public Authorities Law § 1020-f [h].) It is empowered under section 1020-g (e) “[t]o apply to the appropriate agencies and officials of the federal and state governments, for such licenses, permits or approval of its plans or projects as it may deem necessary or advisable, and to accept such licenses, permits or approvals as may be tendered to it by such agencies or officials, upon such terms and conditions as it may deem appropriate”. Furthermore, should LIPA fail to obtain any license, permit or approval it deems necessary or advisable, it can “institute suit, or * * * apply to any legislative body for legislation, or * * * take such other action as it may deem necessary or advisable in the furtherance of the purposes of [the Act] and for the protection of its rights”. (Public Authorities Law § 1020-g [f].) To facilitate the accomplishment of its goals, LIPA was made tax exempt (Public Authorities Law § 1020-p) and was afforded the ability to issue tax-exempt bonds (Public Authorities Law § 1020-k).
In 1995, LIPA’s broad powers were circumscribed by the Legislature through its amendment of section 1020-f of the *214 Public Authorities Law. The PACE was thereby given review power over “projects” undertaken by LIPA. (Public Authorities Law § 1020-f [aa].) A “project” is defined at section 1020-b (12-a) as an action which: (1) causes the authority .to issue bonds, notes or other obligations, or shares in any subsidiary corporation; (2) significantly modifies the use of an asset valued at more than $1 million owned by the authority, or (3) involves the sale, lease or other disposition of such an asset, or commits the authority to a contract or agreement with a total consideration of greater than $1 million and does not involve the day-to-day operation of the authority. The PACE may only approve those LIPA projects which it determines are financially feasible; will not materially adversely affect overall real property taxes in the service area; are anticipated to result in generally lower utility rates in the service area; and, will not materially adversely affect overall real property taxes or utility rates in other areas of the State. (Public Authorities Law § 1020-f [aa].)
The legislative history of this amendment states “greater oversight regarding major decisions of the authority will be possible. By using the standards contained in the bill, the [PACE] will provide an independent evaluation of whether proposed actions of the Authority are financially feasible, do not materially adversely affect overall real property taxes, will result in lower utility costs to customers in the service area, and will not materially adversely affect real property taxes and utility rates outside the LILCO service area.” (Mem of Assembly in Support, 1995 McKinney’s Session Laws of NY, at 2199.)
Ultimately, after years of reviews and negotiations, LIPA, LILCO and Brooklyn Union Gas Company reached an agreement in principle in March 1997. In April 1997, LIPA applied to the PACE for its approval of this project. On June 16, 1997, LIPA authorized execution of the definitive agreements. In brief, LIPA agreed to pay approximately $2.5 billion for LILCO’s common stock, about $4 million for LILCO’s preferred stock and agreed to assume $3.7 billion of LILCO’s preexisting debt. Under the agreement, LIPA is to become the owner of LILCO’s transmission and distribution facilities as well as LILCO’s 18% interest in the Nine Mile Point Two Nuclear Power Plant, all regulatory assets, including Shoreham, and LILCO’s rights and obligations under independent power producer contracts. The agreement also requires LILCO to enter into three separate agreements with LILCO affiliates or subsidiaries: a management services agreement whereby a LILCO affiliate would manage the transmission and distribution *215 system; a power supply agreement whereby a LILCO affiliate would sell electric power to LIPA; and an energy management agreement whereby a LILCO affiliate would purchase fuel for LIPA’s use in operating its generating facilities.
On July 16, 1997, the PACE approved the project under Public Authorities Law § 1020-f (aa) subject to five conditions. Briefly summarized, these conditions are as follows: condition one requires LIPA to establish a plan for open access to the electric system, including a plan to provide options to customers to receive service from other power suppliers within 10 years. Condition two commits LILCO to paying no more than book value for generating assets. Third, LILCO’s affiliate must agree with LIPA to invest at least $1.3 billion in energy-related and economic development projects and natural gas infrastructure projects in Nassau, Suffolk and Queens. As the fourth condition, LIPA must guarantee a 14% rate reduction over a 10-year period, excluding reductions attributable to Shore-ham’s property tax settlement. Lastly, as a fifth condition, LIPA agreed not to implement a rate increase of more than 2Vz% over a 12-month period absent approval by the Public Service Commission after a full evidentiary hearing.
On August 21, 1997, the LIPA Board voted to accept the PACE conditions and again ratified the definitive agreements. A letter agreement implementing these conditions was by necessity executed by LIPA and LILCO.
Petitioner Suffolk County commenced this proceeding by filing a petition and notice of petition on December 18, 1997. The Initiative For Competitive Energy and the Nassau County Legislature both sought permission to intervene and by so-ordered stipulation were permitted to do so.
As for respondents LILCO and Brooklyn Union Gas, the petitions state no cause of action. (See, Cusumano v Iota Indus., 100 AD2d 892, 893.) Nor are these parties necessary to provide petitioners with the relief they seek. The petition against them is accordingly dismissed.
The court by necessity next addresses respondents’ objections.
Petitioner’s demand in its notice of petition that “a verified answer and supporting affidavits be served eight days before the return date” does not render the petition defective or warrant dismissal of this action (CPLR 2001). A briefing schedule was in any event agreed to by all parties.
Similarly unavailing is the Nassau County Legislature’s claim that petitioner is barred by laches and the doctrine of *216 unclean hands. Its participation in hearings hardly amounts to a binding acquiescence. Furthermore, the conditions imposed by the PACE and accepted by LIPA — the essence of what is challenged here — were unknown until the August 21, 1997 approval and accordingly could not have been agreed to by petitioner.
Respondents’ argument that LIPA’s August 21, 1997 resolution was merely a ratification of its June 16, 1997 approval of the definitive agreements and that June 16 is therefore the controlling date for Statute of Limitations purposes is incorrect. The June 16, 1997 LIPA approval of the definitive agreements was clearly not final. LIPA, by statute, was required to obtain the PACE’s approval and could not proceed without it. (Public Authorities Law § 1020-f [aa]). Any challenge to the June 16, 1997 resolution would have been premature. As the Court stated in Cuomo v Long Is. Light. Co. (71 NY2d 349, 354), “courts may not issue judicial decisions that ‘can have no immediate effect and may never resolve anything’ (New York Pub. Interest Research Group [NYPIRG] u Carey, 42 NY2d 527, 531). It is therefore settled law that an action ‘may not be maintained if the issue presented for adjudication involves a future event beyond control of the parties which may never occur’ (e.g., American Ins. Assn. v Chu, 64 NY2d 379, 385; NYPIRG v Carey, 42 NY2d 527, 531, supra; Matter of State Indus. Commn., 224 NY 13, 16, supra).”
While respondents alternatively assert that petitioners should have commenced this proceeding within four months of the PACE’s July 16, 1997 approval, petitioners herein technically do not challenge the PACE’s conditional approval. In any event, not only is the PACE not a party here, any challenge to its acts would be untimely under CPLR 217 since this petition was not filed until December 18, 1997, more than four months after the PACE’s resolution. Petitioners instead assert that LIPA acted unlawfully in accepting the PACE conditions on August 21, 1997. Moreover, contrary to respondents’ contentions, the August 21, 1997 resolution was not merely a ratification of the June 16, 1997 resolution. The PACE’s approval of the definitive agreements was contingent upon LIPA’s actual acceptance and express adoption of important terms and conditions. And, in contrast to the cases relied upon by the respondents, the conditions herein challenged by petitioners were not imposed upon them. In fact, the conditions were theoretical only and wholly lacking in import with respect to petitioners and LIPA until such time as they were accepted by *217 LIPA. It was only then that the conditions — as well as LILCO’s commitment to the definitive agreements — became final and binding. (See, Matter of Healy v Sheldon, 235 AD2d 992; see also, Delaware County Elec. Coop. v Power Auth., 118 Misc 2d 77, revd on other grounds 96 AD2d 154, affd 62 NY2d 877.) It is LIPA’s August 21, 1997 resolution which petitioners challenge here and the proceeding was accordingly timely commenced under CPLR 217. The court notes that this proceeding could in any event be converted into an action pursuant to CPLR 103 (c) insofar as petitioners seek a declaration as to the legality of respondents’ actions, thereby rendering moot respondents’ Statute of Limitations objections. (Matter of Lazore v Board of Trustees, 191 AD2d 764.)
Similarly without merit is respondents’ contention that the PACE is a necessary party here whose absence necessitates the dismissal of this proceeding. Again, petitioners do not challenge the PACE’s authority to impose conditions; rather, they question LIPA’s actions in accepting them. Alternatives to LIPA did indeed exist. It could have elected not to proceed with the definitive agreements or, under Public Authorities Law § 1020-g (f), it could have instituted suit or applied to any legislative body for legislation, or taken such other action it deemed necessary or advisable in the furtherance of its mission for the protection of its rights.
Lastly, Suffolk County has standing, if for no other reason, as a representative of its residents under Public Service Law § 109 which enables municipalities to “appear as a party before * * * any court in any action or proceeding involving rates, service or other matters affecting the municipal corporation or any of its residents” (County of Westchester v Koch, 108 Misc 2d 764, 765, affd 88 AD2d 514).
Turning to the merits, that LIPA was required to apply to the PACE for approval is not disputed. LIPA’s acceptance of the conditions imposed upon the project by the PACE falls smoothly into the LIPA Act’s statutory framework. Section 1020-g (e) specifically permits LIPA to accept approvals upon such terms and conditions as it deems appropriate. The conditions imposed by the PACE all closely relate to the factors enumerated at Public Authorities Law § 1020-f (aa) which the PACE was mandated to consider. The first condition requiring LIPA to establish a plan for permitting retail customers a choice among power suppliers further ensures competition resulting in lower utility rates. The second condition that LIPA not purchase generating assets at a price greater than book *218 value also provides cost containment assurances and concomitantly insures rate reduction. The third condition seeks to further guarantee lower utility rates by mandating investment in energy-related and economic development projects. The fourth and fifth conditions guarantee a minimum rate reduction of 14% over 10 years and preclude precipitous future increases by requiring approval by the Public Service Commission should an increase greater than 2V2% be sought in a 12-month period.
Nor was the LIPA’s acceptance of the conditions arbitrary, capricious or irrational. The conditions are all aimed at rate reduction, the explicit goal of the Act itself. Furthermore, the LIPA Board’s conclusion that it could commit to the conditions is based upon exhaustive analysis by multiple professionals and lengthy hearings and detailed communications.
Petitioners’ argument that LIPA has illegally irrevocably relinquished powers to the PACE is both extreme and inaccurate. Again, LIPA has affirmatively agreed to conditions which it unquestionably could have imposed upon itself. Thus, we find a distinction without a difference. Moreover, to the extent that the conditions create unanticipated problems, LIPA can return to the PACE and modifications can be sought. Should the PACE fail to respond favorably, LIPA can exercise its options under Public Authorities Law § 1020-g (f).
Petitioners assert that condition number four which obligates LIPA to reducing utility rates 14% over 10 years violates LIPA’s obligations under Public Authorities Law § 1020-g (n) which requires that “[a]fter the establishment of [LIPA] and the commencement of its function as a utility, LIPA shall acquire from LILCO all franchise and utility service responsibilities for all ultimate consumers of gas and electricity within LILCO’s former service territory, including the responsibility to provide safe and adequate service”. This court simply fails to see how LIPA’s acceptance of condition four violates its obligations under this section. There is simply no evidence that an inconsistency even exists.
Petitioners also allege that the LIPA’s acceptance of condition number five is in violation of its statutory authority to set utility rates. In accepting condition number five, LIPA has afforded the Public Service Commission only a limited right of review. In any event, Public Authorities Law § 1020-g (e) specifically authorizes LIPA to seek approvals of other agencies and to accept those approvals on terms it deems appropriate. Thus, the statute contemplates LIPA succumbing to the jurisdiction of other agencies. Nothing in the statute indicates *219 that LIPA was intended to have the sole and exclusive authority to set rates. Furthermore, LIPA has not acted arbitrarily, capriciously or irrationally in establishing this boundary.
Petitioners also maintain that Public Authorities Law § 1020-h precludes LIPA from carrying out the definitive agreements. More specifically, petitioners allege that there is not adequate evidence that the compensation paid to LILCO will be “just to the ratepayers” as required by Public Authorities Law § 1020-h (1) (d), and that LIPA is in violation of Public Authorities Law § 1020-h (1) (g) insofar as it has agreed to compensate LILCO for the Shoreham asset. While LIPA argues that the just compensation provision applies only to LILCO’s acquisition via eminent domain, this court simply disagrees. Section 1020-h is entitled “Acquisition of property, including the exercise of the power of eminent domain”. Subdivision (1) (a) speaks of acquisition through purchase or eminent domain, of the securities or the assets of LILCO “whichever is less expensive for the ratepayers, as the authority may determine will be just to the ratepayers in the service area”. Subdivision (1) (b) requires LIPA to negotiate with LILCO before resorting to the exercise of eminent domain; and subdivision (1) (d) states “[t]he compensation paid by the authority to LILCO shall be just to the ratepayers in the service area who must pay such compensation”. This requirement is not limited to acquisition through eminent domain.
Nor is section 1020-h (1) (g) limited to eminent domain acquisitions. That section provides that LILCO “has no reasonable expectation of realizing actual earnings from the Shore-ham plant or of giving effect to any earnings or returns which may have been reflected on the books of LILCO for accounting purposes”. Significantly, these provisions come under subdivision (1), whereby the Legislature made express findings and determinations. In subdivisions (4), (5) and (6) the Legislature specifically addresses eminent domain procedures should same be employed by LIPA.
LIPA’s reliance on section 1020-h (11) is also misplaced. That section simply limits the application of the valuation of stock and property methodology which is specifically set forth in the statute to eminent domain acquisitions. That section does not negate the requirement that the compensation paid by the Authority to LILCO be “just” to ratepayers.
Nevertheless, contrary to petitioners’ allegations, there is no requirement that LIPA make specific findings that the compensation to be paid is just. Rather, in view of the broad discretion *220 involved, a rational showing here that the compensation is in fact “just” will suffice.
The affidavits of Kessel and Nichols, derived from the extensive record, adequately demonstrate that the compensation which the LIPA has agreed to pay LILCO is “just”. LIPA sought and obtained an opinion from its financial advisor which found the deal financially fair based upon a comparison to both stock prices of comparable utilities and mergers and acquisition transactions in the utility industry. In fact, Bear Stearns concluded that LIPA was receiving a discount to fair market value. Petitioners have not shown these conclusions to be irrational.
Petitioners claim that LIPA violated section 1020-q (3) insofar as it agreed to compensate LILCO for its as yet unenforced tax certiorari judgment and further, that LIPA improperly decided to impose a rate surcharge on Suffolk ratepayers. These claims are also without merit.
First, there has been no definitive determination by LIPA to impose a surcharge on Suffolk ratepayers. Thus, this claim is not ripe for judicial review. (See, Employers’ Fire Ins. Co. v Klemons, 229 AD2d 513.) And a careful examination of section 1020-q (3) does not bar LIPA from compensating LILCO for judgments and only precludes LIPA from obtaining property tax refunds from 1976 to 1987. The court additionally notes that as to LILCO, section 1020-q (3) has been found unconstitutional. (Matter of Long Is. Light. Co. v Assessor of Town of Brookhaven, 154 AD2d 188.)
Lastly, the PACB’s conditions are by virtue of the PACE resolution applicable to the definitive agreements. The PACE resolution states that “all proposed transactions and proposed agreements shall be expressly subject to all of the conditions hereinafter provided”. Under section 1020-f (aa) of the Public Authorities Law, PACB’s approval was mandatory. Having failed to seek or obtain relief from the PACB’s conditions, and in fact explicitly accepting them, LIPA is bound to proceed, if at all, in accordance with them. Furthermore, the agreements themselves all explicitly provide that they are subject to agencies’ approvals.
Petitioners further claim that LIPA violated the State Administrative Procedure Act in accepting the PACE conditions and ratifying the definitive agreements is also without merit. This act by LIPA did not constitute rule-making as defined by the State Administrative Procedure Act. (State Administrative Procedure Act § 102 [2] [a].) A rule or regulation is “a fixed, general principle to be applied by an adminis *221 trative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers”. (Matter of Roman Catholic Diocese v New York State Dept. of Health, 66 NY2d 948, 951.)
LIPA’s authorization of the definitive agreements was simply a contract determination limited to that scenario and certainly authorized by Public Authorities Law § 1020-h. Contracts entered into by government agencies have not been interpreted as a rule so as to require compliance with the State Administrative Procedure Act. (See, Matter of Pallette Stone Corp. v State of N. Y. Off. of Gen. Servs., 245 AD2d 756.) Nor did LIPA’s acceptance of the PACE’S conditions amount to rule-making under the State Administrative Procedure Act. Absolutely none of the conditions impose a uniform procedure to be applied across the board in the future and all conditions continue to vest LIPA with some discretion (see, Matter of New York City Tr. Auth. v New York State Dept. of Labor, 88 NY2d 225, 229; Matter of Pallette Stone Corp. v State of N. Y. Off. of Gen. Servs., supra). Many aspects of the PACE conditions involve isolated one-time policy decisions which lack broad prospective applications to other scenarios.
Petitioners’ attempt to subject the agreements to the State Environmental Quality Review Act (ECL art 8 [SEQRA]) also fails. Public Authorities Law § 1020-s (2) provides: “The issuance by [LIPA] of its obligations to acquire the securities or assets of LILCO shall be deemed not to be ‘state action’ within the meaning of [SEQRA], and [SEQRA] shall not be applicable in any respect to such acquisition or any action of [LIPA] to effect such acquisition.” Public Authorities Law § 1020-ff instructs the court to interpret the Act liberally to effect its purposes. Indeed, the Court of Appeals has already interpreted the Act to exempt LIPA’s acquisition of Shoreham from SEQRA. (Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398, supra.) Petitioners’ arguments that LIPA’s acceptance of the PACE’s conditions goes beyond the exemption is disingenuous. The Act exempts any action by LIPA to effect the acquisition from SEQRA. Furthermore, pursuant to the statutory framework, these actions are all necessary to effect the acquisition.
It is therefore declared that the August 21, 1997 action of *222 LIPA in ratifying the definitive agreements and accepting the PACE conditions was lawful. The petition is denied and the proceeding is dismissed.