**COUNTY OF SUFFOLK, Town of Huntington, and Town of Babylon, Plaintiffs,**

v.

**LONG ISLAND POWER AUTHORITY, Richard M. Kessel, As Chairman of the Long Island Power Authority, Keyspan Energy, Inc., Long Island Lighting Company, William J. Catacosinos, Theodore A. Babcock, James T.**

Flynn, Joseph E. Fontana, Robert X. Kelleher, John D. Leonard, Jr., Adam M. Madsen, Kathleen A. Marion, Joseph W. McDonnell, Leonard P. Novello, Richard Reichler, William O. Schiffmacher, Robert B. Steger, William E. Steiger, Jr., and "John Does", Defendants.

No. 98–CV–5996(ARR).

United States District Court, E.D. New York.

Aug. 14, 2000.

Irving Like, Reilly, Like, Tenety & Ambosino, Babylon, NY, for County of Suffolk, Town of Huntington.

William Douglas Wexler, North Babylon, NY, for Town of Babylon.

Kenneth A. Novikoff, Rivkin, Radler & Kremer, Uniondale, NY, for Long Island Power Authority, Richard M. Kessel.

John E. Reilly, Keyspan Energy, Hicksville, NY, for Keyspan Energy, Inc.

John B. Grant, Jr., Greenberg Traurig, LLP, New York City, for William J. Catacasinos.

Guy Miller Struve, Davis Polk & Wardwell, New York City, for Theodore A. Babcock, Joseph E. Fontana, Robert X. Kelleher, John D. Leonard, Jr., Kathleen A. Marion, Joseph W. McDonnell, Leonard P. Novello, Richard Reichler, William O. Schiffmacher, Robert B. Steger, William E. Steiger, Jr.

## OPINION AND ORDER

ROSS, District Judge.

Plaintiffs, Town of Huntington and Town of Babylon, bring this action pursuant 42 U.S.C. § 1983 seeking a declaration that by virtue of having purchased electricity from defendant Long Island Lighting Company ("LILCO") they have a property or contract-based right to capital gains and "excess" deferred taxes allegedly realized upon the acquisition of LILCO by the Long Island Power Authority ("LIPA"). Plaintiffs also seek restitution of executive compensation packages paid to LILCO's Chairman and certain other LILCO officers. Defendants have moved to dismiss on a variety of grounds. For the reasons stated below, defendants' motions are granted and all pending claims are dismissed.[1]

## FACTUAL BACKGROUND

This case arises out of a series of actions taken by the New York State legislature and the New York State Public Service Commission ("PSC") to address serious financial trouble experienced by LILCO largely as a result of its construction of the Shoreham nuclear plant. A brief discussion of the complicated proceedings that led up to this law suit will suffice. For the purposes of this motion, plaintiffs' factual allegations are of course accepted as true.

In the early 1980s, LILCO was well into its construction of the Shoreham nuclear plant; the costs associated with construction had already far exceeded their initial estimates and there was increasing concern that the plant would never be operable. Electric rates charged to customers on Long Island ("ratepayers") escalated sharply. In 1986, the New York State legislature enacted the Long Island Public Authority Act, N.Y. Pub. Auth. L. § 1020 et seq. (McKinney's 1994 & Supp.2000) ("LIPA Act"), which created the Long Island Public Authority ("LIPA"), a publicly-owned power authority. The legislative findings recited in the Act specifically recognize that LILCO's decision to construct Shoreham was imprudent and created significant rate increases for the ratepayers. See N.Y. Pub. Auth. L. § 1020-a. LIPA was authorized to purchase gas and electric power and set rates for the furnishing of gas and electric power for ratepayers on Long Island. See N.Y. Pub. Auth. L. § 1020-f. LIPA was also authorized to purchase or acquire through the exercise of eminent domain LILCO's stock or assets. See N.Y. Pub. Auth. L. § 1020-h. Under the law, LIPA enjoyed considerable autonomy in its authority to set rates and

---

1. The original complaint named the Public Service Commission ("PSC") and its chairperson as additional defendants. By stipulation and order dated January 15, 1999, plaintiffs discontinued their claims against the PSC and its chairperson. By order dated March 23, 2000, plaintiff County of Suffolk discontinued its claims against all defendants pursuant to a stipulated agreement. The court notes that although plaintiffs allege that they bring their claims pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all similarly-situated electric utility ratepayers in Suffolk County, see Complaint ¶¶ 15–16, plaintiffs have not moved for class certification. Accordingly, the court decides this issue solely with respect to plaintiffs' individual claims.

to negotiate a purchase of LILCO. An amendment to the law passed in 1995, however, required that any project that caused LIPA to issue bonds, notes, or shares of stock or that committed LIPA to a contract with a greater consideration than $ 1 million (including, most notably, any acquisition of all or a significant portion of LILCO's stock or assets) be submitted for approval to the Public Authorities Control Board ("PACB"). *See* N.Y. Pub. Auth. L. § 1020–f(aa). The PACB was authorized to approve such an acquisition only upon a finding that the transaction was, among other things, anticipated to result in generally lower utility rates in the service area. *See id.*

During the 1980s, several entities filed suit against LILCO based on the cost overruns, safety concerns, and alleged fraud associated with the construction of the plant and the related rising electric costs. In 1989, LILCO, the New York State Governor, LIPA, and several other parties reached a proposed settlement agreement ("Shoreham Settlement," attached as Exhibit P–2 to Plaintiffs' Response to Defendant Keyspan's Statement Pursuant to Local Civil Rule 56.1 [hereinafter "Pl. 56.1 Stmt"])[2] that discontinued many of the pending law suits in exchange for several measures designed to ensure lower rates and to stabilize LILCO's precarious financial situation. The settlement provided that LIPA would acquire the Shoreham plant for consideration of $1. *See* Shoreham Settlement, at ¶ 1. A Rate Moderation Agreement, attached as Exh. P–2C to Pl. 56.1 Stmt, adopted in conjunction with the settlement provided for the

creation of a rate-payer funded "Financial Resource Asset" ("FRA"). Briefly stated, the FRA was an accounting device that provided a replacement for costs associated with the construction of the Shoreham plant that, in the absence of the settlement, would have been included in LILCO's rate base for the purposes of rate-making. The agreement also provided that LILCO would operate under an earnings cap. The settlement and plan were submitted to the PSC for approval and, after an exhaustive review of the merits of the proposed plan and the objections submitted by various parties, the PSC granted conditional approval of both the settlement and the related creation of the FRA. *See Re Long Island Lighting Co.,* PSC Op. 89–8, 101 P.U.R.4th 81 (Apr. 13, 1989), attached as Exh. P–2B. The rate plan was subsequently implemented.

Throughout this time, plaintiffs contend that LILCO enjoyed various federal tax deferrals in connection with the write-off of the Shoreham construction costs. *See* Complaint ¶ 33. Plaintiffs also contend that throughout this time, their rates were set to reimburse LILCO for these deferred taxes as *if* LILCO were in fact currently paying the taxes. Complaint ¶ 34. Plaintiffs contend that these payments have created a "deferred tax reserve." Complaint ¶ 35.

In the mid 1990s, LIPA began negotiating a takeover of LILCO pursuant to its statutory authority under the LIPA Act. It was eventually agreed that many LILCO assets, including its natural gas and fossil generation assets, would be transferred to a private holding company owned by de-

---

**2.** At one point in the complicated procedural history of this action, defendants filed a motion for summary judgment which was subsequently withdrawn. In a conference call held July 31, 2000 between plaintiffs' lead counsel, defendants' lead counsel, and the court's clerk, it was agreed that in deciding this motion to dismiss, the court would consider only those exhibits that are matters of public record and which are cited in plaintiffs' papers: Exhs. P–1, P–2, P–2A, P–2B, P–2C, P–3, P–6, P–7, and P–10. Plaintiffs' Rule 56.1 statement itself is not properly before the court and has not been considered.

fendant Keyspan Energy, Inc. (then known as "MarketSpan"), in anticipation of a merger with Brooklyn Union Gas, also owned by Keyspan. LIPA was then to acquire control of LILCO's remaining assets by buying LILCO's equity securities at 99.9% of book value and assuming various LILCO liabilities. Complaint ¶ 74.

Pursuant to the amended LIPA Act, the proposed merger was reviewed by the state PACB. On July 16, 1997, the PACB approved the transaction. Complaint ¶ 74–0; see also Suffolk County v. Long Island Power Authority, 177 Misc.2d 208, 215, 673 N.Y.S.2d 545, 551 (N.Y.Sup.1998) (reviewing the transaction and noting that PACB approval was subject to various conditions, including that LIPA guarantee a 14% rate reduction over a 10–year period). On or about March 6, 1998, the Internal Revenue Service issued favorable private letter rulings to LILCO regarding the tax consequences of the transaction, indicating that the LIPA takeover of LILCO would be tax-free, thereby extinguishing the deferred taxes which had been funded by the ratepayers in anticipation of LILCO's expected future tax liability. Complaint ¶¶ 42–43. The deal closed on or about May 28, 2000. Complaint ¶ 73.

In and around December 1997, as the LIPA/LILCO deal was pending, the LILCO board approved executive compensation benefits for several high-ranking LILCO executives. Plaintiffs contend that these compensation packages totaled $67 million, including $42 million to the LILCO former chairman defendant William J. Catacosinos and $25 million to other LILCO officers also named as defendants in this action. Complaint ¶¶ 74–Q, 79. These compensation packages allegedly were not disclosed in filings to the Securities and Exchange Commission ("SEC") or to LIPA in the takeover negotiations. In June 1998, one week after the LIPA/ LILCO deal closed, Governor Pataki and LIPA chairman Richard M. Kessel publicly disclosed these "golden parachutes" and Governor Pataki called for Catacosinos to resign. Complaint ¶ 80.

## DISCUSSION

### I. Causes of Action and Relief Sought

Plaintiffs' first, second, and third causes of action are brought against LIPA alleging under various legal theories that the Shoreham settlement agreement and the related rate moderation agreements establishing the ratepayer-funded FRA gave rise to "enforceable contracts" that gave ratepayers a "property right" to any capital gain realized in connection with LIPA's takeover of LILCO superior to that of LILCO's shareholders. Plaintiffs' first claim alleges that the LIPA Act, as applied in LIPA's takeover of LILCO, deprived plaintiffs of their contractual rights to this gain, thus violating Article I, Section 10, cl. 1 of the United States Constitution. Complaint ¶¶ 121–24. Plaintiffs' second cause of action alleges that the transfer of plaintiffs' property interest in the capital gain was effected without providing ratepayers notice and an opportunity to be heard, thus violating plaintiffs' rights to due process under the fifth and fourteenth amendments to the United States Constitution and various provisions of the New York state constitution. Complaint ¶¶ 125–26. Plaintiffs' third cause of action alleges that this transfer was a governmental "taking" of their property for which they did not receive just compensation, also a violation of the plaintiffs' due process rights under the federal and state constitutions. Complaint ¶¶ 127–28.

Plaintiffs' fourth and fifth causes of action are brought against Keyspan. Plaintiffs' fourth claim alleges breach of contract, claiming that Keyspan, as a successor in interest to LILCO, has con-

tractual obligations under the settlement agreement and that it violated an implicit agreement to give ratepayers the capital gain realized on the transaction prior to distribution to its shareholders. Complaint ¶¶ 129–30. Plaintiffs' fifth claim alleges that Keyspan has converted money and been unjustly enriched by the deal and is under a duty to account for, and make restitution of, any portion of the deferred tax reserve not being credited to the ratepayers. Complaint ¶¶ 131–32. The sixth and seventh causes of action are brought against LILCO's officers, alleging that the officers who received the above-described compensation packages have been unjustly enriched at the expense of the ratepayers, Complaint ¶¶ 133–34, and that the officers have tortiously interfered with provisions of the Shoreham agreement that plaintiffs contend provide that no portion of the FRA was to be used for executive compensation. Complaint ¶¶ 135–36.

Plaintiffs seek a declaration of a superior right in the "capital gain" from the LIPA transaction and "any excess deferred tax reserve" and a judgment that the LIPA/LILCO arrangement and the LILCO executive compensation packages violated the state and federal rights outlined above. Plaintiffs also seek attorneys' fees, as well as any additional relief this court deems appropriate.

## II. *Motion to Dismiss Standard*

In evaluating a motion under Rule 12(b)(6), the court must view the pleadings in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989). Further, the court must accept all well-pleaded facts in the complaint as true. *See id.* Dismissal is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## III. *Filed Rate Doctrine*

■ Defendants contend that although classified as an action for declaratory relief in connection with the disposition of proceeds related to LIPA's takeover of LILCO, plaintiffs' claims are, in reality, attacks on the rates charged and, as such, are barred by the filed rate doctrine. This court agrees.

■ The filed rate doctrine bars suits that challenge as unreasonable or unlawful the rates charged by a regulated industry. "Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir.1994). The doctrine is premised on a concern with potential discrimination in rates between ratepayers and others and a concern with the propriety of a court's substituting its judgment as to reasonable rates for that of an agency with specialized knowledge of the area. *See id.* at 19. The filed rate doctrine has been recognized to bar claims brought pursuant to both federal and state law that challenge rates set by both federal and state agencies. *See, e.g., Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998) (affirming dismissal of state claims alleging fraud, unjust enrichment, and violation of New York's consumer protection act in connection with long-distance telephone rates regulated by federal agency); *Wegoland,* 27 F.3d at 18 (affirming dismissal of federal RICO claims and various state claims in connection with local telephone rates regulated by New York state PSC); *Porr v. NYNEX Corp.,* 230

A.D.2d 564, 567, 660 N.Y.S.2d 440, 442 (N.Y.A.D.1997) (dismissing various state fraud, unjust enrichment, false advertising, and other claims in connection with local telephone rates regulated by New York state PSC).

The filed rate doctrine is construed broadly; it bars any claim that in any way seeks relief based on the payment of rates on file:

> It has repeatedly been held that a consumer's claim, however disguised, seeking relief for an injury allegedly caused by the payment of a rate on file with a regulatory commission, is viewed as an attack upon the rate approved by the regulatory commission.

*Porr,* 230 A.D.2d at 568, 660 N.Y.S.2d 440. Any claim that the rates are unreasonable, including a claim that such unreasonableness was the result of fraud committed by a defendant upon a rate-setting agency, is barred by the filed rate doctrine. *See, e.g., Wegoland,* 27 F.3d at 20. Plaintiffs contend that the Shoreham settlement agreement and the related rate moderation agreement creating the FRA and the "deferred tax reserve" give rise to a contract or property-based interest somehow apart from their payments of rates. Accordingly, this court must determine whether plaintiffs' claims are in fact something distinct from an attack upon the rates paid.

The court starts from the basic and obvious premise that plaintiffs bring suit as "ratepayers"—their claims are derived from their payment of filed rates. Although the FRA was part of a negotiated resolution set forth in the rate moderation agreement among several parties involved in pending litigation, its provisions were conditioned upon approval by the PSC. *See* Rate Moderation Agreement (Exh. P–2C), at ¶ 8. The PSC approved the inclusion of the FRA as a portion of the basis of the filed rates charged to the ratepayers. *See*

*Re Long Island Lighting Co.,* PSC Op. 89–8 (Exh. P–2B), at 28, Similarly, as set forth in plaintiffs' complaint, the PSC reviewed and approved the inclusion in the rates of compensation for the federal taxes that were deferred and ultimately forgiven. *See* Complaint ¶ 34. In other words, to the extent that the creation of the FRA in connection with the Shoreham settlement, or the treatment of taxes before or after the settlement, had any effect on the payments made by plaintiffs, such payments were for electrical services on the basis of filed tariffs approved by the state public service commission. Plaintiffs have paid nothing except their rates.

Plaintiffs cite *Democratic Central Committee v. Washington Metropolitan Area Transit Commission,* 485 F.2d 786 (D.C.Cir.1973), and its progeny for the proposition that a rate-making agency may take into consideration ratepayers' assumption of risk associated with an asset and accordingly pass along to the ratepayers gain realized on the distribution of the asset. Plaintiffs note that this proposition was recently reaffirmed by the New York Court of Appeals. *See New York Telephone Co. v. Public Service Commission,* 95 N.Y.2d 40, 710 N.Y.S.2d 305, 731 N.E.2d 1113 (2000) (holding PSC could direct New York Telephone to pass on to ratepayers the intrastate portion of its profit from the sale of an asset partially funded by ratepayers). These cases, however, undermine plaintiffs' argument that the FRA—and any gain associated with it—is not properly considered part of the rate paid. It is precisely because agencies *can* require ratepayers to fund development of such assets and then require that gains associated with such assets be passed along to the ratepayers that plaintiffs' attack on the FRA and the "deferred tax reserve" is properly deemed an attack on the filed rates. Thus, whether fash-

ioned as a claim that LIPA failed to protect plaintiffs' interests as required under the LIPA Act (first, second, and third causes of action) or that Keyspan failed to adhere to the commitments made by LILCO under the settlement agreement (fourth and fifth causes of action), plaintiffs' claim that they did not receive a reasonable "return" on the portion of their rates based on the FRA or the anticipated tax liabilities is nothing other than a claim that either the rates they have been charged, or the rates they will be charged under the LIPA/LILCO agreement, are too high.[3]

Plaintiffs' challenge to the executive compensation packages (the sixth and seventh claims) is also barred by the filed rate doctrine. For the purposes of this motion, the court must accept plaintiffs' contention that the compensation packages were funded by ratepayers.[4] Again, however, plaintiffs bring suit as rate payers challenging the use made of the rate-payments that they made. LILCO's expenditures, including executive compensation, are reviewed by the PSC in the ratemaking process. Plaintiffs may or may not be right that under the Shoreham agreement and related rate moderation agreements the executive compensation packages could not be included in the rate base. However, to the extent that such charges *were* included in the rate base, plaintiffs paid for such services pursuant to the filed tariffs. Plaintiffs' allegation that LILCO fraudulently failed to disclose the executive compensation packages in its filings to the SEC and its negotiations with LIPA does not change this analysis. As noted above there is not a fraud exception to the filed rate doctrine. *See, e.g., Wegoland,* 27 F.3d at 20.

■ At bottom, plaintiffs' claims are nothing more than an allegation that LIPA's takeover of LILCO was a bad deal for Long Island ratepayers. This may or may not be so. However, "[a]pplication of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results." *Marcus v. AT & T Corp.,* 138 F.3d 46, 58 (2d Cir.1998) (citing cases). Whether or not the rate payers on Long Island have paid higher rates than they should have, and whether or not the arrangements under which LIPA acquired

---

**3.** Plaintiffs' reliance on *Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 574 (S.D.N.Y.1999), is also misplaced. In *Black Radio,* the plaintiffs were information providers who produce recorded messages about such topics as sports, financial news, horoscopes and the weather. The messages could be accessed when telephone users called a certain number. Defendant NYNEX was responsible for maintaining equipment to tally the actual number of calls made by telephone users to the plaintiffs' numbers. Judge Chin found that plaintiffs' claim that NYNEX had failed to record the calls properly was not barred by the filed rate doctrine because it was a claim that NYNEX had failed to comply with the filed tariffs rather than a challenge to the reasonableness of the filed tariff themselves.

In this case, by contrast, plaintiffs contend that the filed tariff and the takeover of LILCO by LIPA did not give proper consideration to the FRA and anticipated taxes paid by plaintiffs under the filed tariffs. As explained above, this is properly viewed as an attack on the reasonableness of the rates and thus barred by the filed rate doctrine.

**4.** The court notes, however, that plaintiffs have cited a report issued by the Office of the New York State Attorney General which concludes that the money used to pay the executive compensation packages came from LILCO's retained earnings (and thus the shareholders) rather than the ratepayers. *See* "Report on the Investigation of Executive Severance Compensation Packages by the Long Island Lighting Company" (issued Apr. 28, 1999), attached as Exh. P–3 to Pl. 56.1 Stmt, at 4.

its interest in LILCO's assets failed to account adequately for such payments, plaintiffs' claims are necessarily a challenge to the reasonableness of past and future rates. Under the filed rate doctrine, this court does not have jurisdiction to decide plaintiffs' claims.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted. All pending claims are dismissed. The Clerk of Court is instructed to enter judgment accordingly.

SO ORDERED.