Gus "Skip" DALEURE, Jr., et al.

v.

Commonwealth of KENTUCKY, et al.

No. CIV. A. 3:97–CV–709H.

United States District Court,
W.D. Kentucky,
Louisville Division.

Feb. 9, 2000.

Bart Adams, Louisville, KY, F. Thomas Conway, Louisville, KY, for plaintiffs.

Mary R. Harville, Reed, Weitkamp, Schell, Cos & Vice, Louisville, KY, James R. Cox, Louisville, KY, for Commonwealth of Kentucky.

Denise G. McElvein, Office of the Attorney General, State of Missouri, St. Louis, MO, for State of Missouri.

Melanie Straw–Boone, Louisville, KY, Dave Whalin, Landrum & Shouse, Louisville, KY, for Grayson County Fiscal Court, Bullitt County Fiscal Court, Larue Fiscal Court, Fiscal Court of Franklin County, Kentucky, and Oldham County Fiscal Court.

Suzanne D. Cordery, Asst. Jefferson County Atty., Louisville, KY, for Jefferson County Fiscal Court.

C. Kent Hatfield, Charles G. Middleton, III, Henry S. Alford, Middleton & Reutlinger, Louisville, KY, Thomas F. O'Neill, III, Adam H. Charnes, Washington, DC, for MCI Telecommunications Corp., LDDS Worldcom.

John E. Selent, Dinsmore & Shohl, Louisville, KY, Matthew W. Breetz, Stites & Harbison, Louisville, KY, for Invision Telecom, Inc.

William H. Hollander, Wyatt, Tarrant & Combs, Louisville, KY, Elise P.W. Kiely, Blumenfeld & Cohen, Washington, DC, Glenn B. Manishin of Patton, Boggs, Mc-Lean, VA, for Gateway Technologies, Inc.

Gary E. Smith, Graham, Bright & Smith, Dallas, TX, for Security Telecom Corp.

## MEMORANDUM OPINION

HEYBURN, District Judge.

The Court must now turn to the remaining Defendants', the Fiscal Courts[1] and the Telephone Companies[2], motions to dismiss the pending Sherman Act and Section 1983 claims.[3] Defendants contend that Plaintiffs cannot establish the essential elements of a Section 1 Sherman Act claim or a 42 U.S.C. § 1983 equal protection claim and that the filed rate doctrine, state action immunity, primary jurisdiction and the Johnson Act bar all judicial remedies.

In deciding a 12(b)(6) motion, the Court must accept as true all factual allegations made in the complaint. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). The Court should not grant a Rule 12(b)(6) motion to dismiss unless it is convinced "beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277, 279 (6th Cir.1987). Relying on this standard of review, the Court examines in turn each allegation and the prevailing legal doctrines which may also apply.

### I.

For purposes of the motion to dismiss, the Court considers the following facts as true.[4] Each Fiscal Court operates a jail facility for its county and, in some cases, surrounding counties. Each Telephone Company provided telephone service for one or more of the jails. Plaintiffs are a group of persons who have paid for collect phone calls received from a jail inmate. These claims arise because each Fiscal Court entered into an exclusive agreement with a Telephone Company to provide inmate phone service. To do so, each Fiscal Court requested bids from the Telephone Companies. The request for bids detailed the services that the Telephone Companies must provide. At the end of a competitive bidding process, each Fiscal Court award-

1. These Defendants include the Fiscal Courts of Grayson, Oldham, Bullitt, Lame, Franklin and Jefferson Counties in Kentucky.

2. These defendants include Invision Telecom, Inc.; MCI Telecommunications Corp.; LDDS WorldCom d/b/a Worldcom, Inc.; Gateway Technologies, Inc. and Security Telecom Corporation.

3. Previously, this Court has considered other claims and defenses in this case. By Memorandum Opinion dated October 8, 1999, the Court dismissed the Missouri, Indiana and Arizona state government defendants due to the absence of personal jurisdiction. By Memorandum Opinion dated October 12, 1999, the Court dismissed the Commonwealth of Kentucky defendants based upon their Eleventh Amendment sovereign immunity. The following day the Court dismissed all Robinson–Patman Act claims. Finally, by Memorandum Opinion dated November 8,

1999, the Court dismissed all monetary claims against the Fiscal Court Defendants under the Sherman Act based on the local government Anti–Trust Act. Consequently, under the Sherman Act only injunction relief remains against the Fiscal Courts. However, in that opinion this Court held that the state action immunity doctrine did not bar Sherman Act claims. The Court reached this result by concluding, among other things, that the general state government authorization of Fiscal Courts to operate jails did not foreseeably result in the suppression of competition for telephone service.

4. If the case proceeds, Defendants would challenge many of these "facts," but for purposes of the motion to dismiss, the Court must view the facts in the light most favorable to Plaintiffs.

ed the contract to the qualified Telephone Company that bid the highest commission per call, thus maximizing the Fiscal Court's revenue from inmate calls. These commissions have been as high as 55%.

Each jail facility tightly regulates inmate calls. Inmates cannot receive calls from the outside. They may place collect calls only through the exclusive Telephone Company provider. They have no access to a live operator. Neither the inmates nor the call recipients have a choice of carrier or calling options. Neither can shop for service or price. Jail regulations often limit inmate calls to 15 minutes duration. In addition to a per minute charge, Telephone Companies assess a surcharge for each call that is placed, even if the call only re-connects an earlier conversation cut off by the fifteen minute time limitation.[5]

State and federal regulatory agencies approved all of the Telephone Companies' rates. Telephone Companies filed all intrastate surcharges and per minute rates for inmate calls with the Kentucky Public Service Commission ("PSC").[6] The PSC approved these rate requests with little or no independent investigation. Interstate rates are also monitored. Telephone Companies filed all interstate rates with the Federal Communications Commission (FCC). *See* 47 USC § 201 et seq. In this

case, the PSC or the FCC approved all relevant rates.

Telephone Companies cannot deviate from the rates filed with the PSC or FCC without filing and receiving approval for new rates.[7] *See* KRS 278.160 through KRS 278.190. Anyone effected by the filed rates, including callers or recipients of calls, can petition the appropriate regulatory authority for a review of the rates at any time. *See* KRS 278.190.

Based on the restrictive services available and high prices, the exclusive contracts have unfairly benefited the Fiscal Courts and the Telephone Companies at the expense of the recipients of inmate calls. The Fiscal Courts and Telephone Companies benefited by receiving excessive revenues from each inmate initiated phone call. Each cooperated to charge rates far greater than the costs associated with providing the telephone and related services to inmates in local jails. The recipients of the inmate collect calls bore the burden of these excessive rates.

In response to the abuses alleged in this case, in 1997 Plaintiffs petitioned the PSC for review of the rates and services available to inmates. After examining the rates at issue, the PSC determined that some of them were "unjust and unreasonable." The PSC lowered those rates.[8]

---

**5.** Prior to this litigation, that surcharge was $ 3.00 per call. The Kentucky Public Service Commission (the "PSC") has since reduced the surcharge to $ 1.50.

**6.** KRS Chapter 278 grants the PSC exclusive jurisdiction over public utility rates in the state. *See Carr v. Cincinnati Bell, Inc.,* 651 S.W.2d 126, 127 (Ky.Ct.App.1983).

**7.** Pending approval with the PSC, after five months, Telephone Companies may enact a rate change on a temporary basis if certain conditions are satisfied. Sometimes, Telephone Companies seek approval for a range of rates, referred to as a "band". Telephone Companies may also state that the surcharge assessed will follow the local exchange carriers's tariff, rather than stating a specific amount. In either instance, Telephone Companies are then free to charge any amount falling within the designated spectrum.

**8.** A brief history of PSC Orders dealing with confinement facilities; In January 1992 Administrative Case No. 337 exempted confinement facilities from the rules that apply to other facilities with payphones. The Order stated, "Inmate phone service will only provide automated collect or debit card service for local and long-distance calls from payphones located at correctional or mental health facilities in accordance with institutionally authorized telephone program."

In response to complaints of Plaintiffs, the PSC began reviewing the reasonableness of inmate telephone rates in November 1997. After a public hearing and reviewing both sides' briefs, on January 15, 1999 in Administrative Case No. 368: *Rates, Terms and Conditions for Inmate Telecommunications Services,* the PSC ordered all Telephone Companies to reduce their operator surcharge for inmates to a surcharge that was no higher than the

The PSC has no authority to award damages or grant injunctive relief. Therefore, the recipients of inmate calls that were "overcharged" in the past have not been awarded compensation, nor have commissioned, exclusive provider agreements been banned.

Plaintiffs can also seek rate relief from the FCC, although to the best of this Court's knowledge they have not chosen to do so. Unlike the PSC, the FCC has the authority to award damages or injunctive relief if it considers them warranted. *See* 31 Fed. Proc., L.Ed. § 73:323.[9]

## II.

■ This case implicates a broad range of concerns at the heart of the regulatory process. Extensive federal and state regulation of telephone rates raises issues

about the appropriate role of the federal courts in policing the rate-making process. The doctrine of primary jurisdiction, for instance, touches on this concern.[10] Moreover, the Court understands that local governments need freedom to solve the difficult and inherent problems of penal systems. While these legal doctrines are analytically distinct, one cannot ignore their common doctrinal threads.

The idea that sovereign entities and even local governments should have special protections from lawsuits and civil liability is deeply ingrained in our culture and law. This Court has already considered several aspects of this legal mosaic. The Eleventh Amendment protects the Kentucky state government and the Kentucky Department of Corrections from suit.[11] *See* October

surcharge paid by the general public for any other collect call. The order also initiated Administrative Case No. 378: *Establishment of an Operator Surcharge Rate for Collect Calls from Confinement Facilities* and Administrative Case No. 379: *Obligations of Inmate Service Providers to Call Recipients Regarding Notice of Blocking and Billing Procedures* and required that all inmates service providers identify themselves on a recording that call recipients hear and disclose how the consumer may obtain rates in accordance with FCC requirements no later than March 1, 1999.

After rehearing on Case No. 378, in July of 1999, the PSC ordered that all surcharges on inmate calls originating from confinement facilities not exceed $ 1.50 per call (a reduction from the $ 3.00 previously charged and lower than the surcharge applied to the general public), effective November 15, 1999 or at the expiration of existing contracts. The order also stipulated that no set-use fees could be assessed against inmate calls and capped intraLATA and interLATA toll charges on inmate calls at July 1, 1999 rates, allowing increase only upon good cause shown.

Case No. 378 was reheard again in August 1999. In that Order, the PSC granted rehearing on the appropriate cap on toll rates. Until a final decision is reached, carriers may charge up to $ 0.28 for interLATA inmate calls and $ 0.23 for IntraLATA inmate calls, effective November 15, 1999 or at contract expiration but at least by June 30, 2000. The surcharge reductions ordered in the July 1, 1999 opinion must also take effect prior to June 30, 2000.

9. One reason that Plaintiffs may not have sought relief from the FCC is that the FCC has already granted some relief similar to what Plaintiffs obtained from the PSC and has expressly rejected other relief Plaintiffs might seek. Specifically, the FCC mandated oral disclosure requirements for interstate collect calls initiated by prison inmates but rejected a billed party preference system and setting inmate tariff rate caps. *See* 63 *FR* 11612; 47 CFR § 64.710.

10. The doctrine of primary jurisdiction counsels that a court having original jurisdiction over the case should stay the proceedings or order dismissal pending the determination of one or more issues by the regulatory agency. *See Reiter v. Cooper*, 507 U.S. 258, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993). Courts should defer to the appropriate regulatory authorities on issues falling within their particular zones of expertise. *Id.*

The Court stayed this action to allow the PSC to address complaints about the rates Telephone Companies charge recipients of inmate collect calls. The PSC has now acted. In some areas the PSC, at least, is without power. It cannot, for instance, determine the legality of certain contractual relationships at issue. The Court, where possible, should address the remaining legal issues. In this opinion at least, the Court can do so without encroaching on regulatory authority.

11. Ironically, some of the Fiscal Courts only participated in the contracts negotiated by the state Department of Corrections, an immune

12, 1999 Memorandum Opinion. The Local Government Anti–Trust Act steps in where the Eleventh amendment leaves off. It immunizes local governments, such as the Fiscal Courts, from monetary damages otherwise recoverable under the Sherman Act. *See* November 8, 1999 Memorandum Opinion. Moreover, both the Fiscal Courts and the Telephone Companies made strong arguments that the state action immunity doctrine described in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) exempts them from Sherman Act liability. Although the Court did not adopt that position, the policy foundations for *Parker* state action immunity coincide interestingly with the filed rate doctrine.

### A.

The filed rate doctrine originated with Justice Brandeis' opinion in *Keogh v. Chicago and Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922).[12] In *Keogh*, the Supreme Court barred the plaintiffs anti-trust claim based on a price fixing conspiracy because the Interstate Commerce Commission had approved defendants' rates, even though those rates were higher than those possible in a competitive market. Justice Brandeis offered four reasons for creating this judicial exemption from Sherman Act liability. First, he said that an anti-trust remedy

was unnecessary because the Interstate Commerce Act provided actual damages and attorney's fees. *Keogh,* 260 U.S. at 162–63, 43 S.Ct. 47. The filed rate also prevented rate discrimination between shippers. *Id.* at 163, 43 S.Ct. 47. Brandeis was concerned that those customers who sued would enjoy lower rates than other customers. Moreover, Brandeis pointed out that calculating damages in such cases might require the Court to determine the hypothetical rate that would have been approved by the regulatory body absent the anti-competitive conduct. Courts are not generally adept in this role. *Id.* at 163–64, 43 S.Ct. 47. Finally, Brandeis reasoned that plaintiffs' losses were too speculative to calculate. *See id.* at 164–65, 43 S.Ct. 47.

While upholding the filed rate doctrine, some courts have roundly rejected *Keogh* on analytic grounds.[13] Applying the same four factors in our circumstances produces a mixed result. Three factors distinguish our case from *Keogh*. First, unlike the ICC, the PSC lacks jurisdiction to award damages or fees.[14] This makes the court's ability to redress any past wrongs more important, since the court is the only forum in which Plaintiffs may seek relief.[15] Second, Plaintiffs are seeking class certification.[16] This could prevent the suit from resulting in price discrimination. Finally,

---

body, pursuant to the Kentucky Model Procurement Code. *See* KRS 45A.050(4).

**12.** Some trace the doctrine even further back to *Texas & Pacific Railway v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907).

**13.** Plaintiffs echo these criticisms. *See Square D. Co. v. Niagara Frontier Tariff Bureau,* 760 F.2d 1347 (2d Cir.1985) (Judge Friendly follows *Keogh* but criticizes the logic of the decision), *Square D. Co. v. Niagara Tariff Bureau,* 476 U.S. 409, 90 L.Ed.2d 413, 106 S.Ct. 1922 (1986) (stating that *Keogh* may have been "unwise as a matter of policy" but reaffirming it because Congress had not overturned it despite the opportunity).

**14.** However, the FCC mirrors the ICC in that it is authorized to award damages or other relief as necessary.

**15.** Whether the filed rate doctrine applies to state agencies that lack the ability to provide damages appears to be an issue of first impression in the Sixth Circuit. The Eleventh Circuit has held that the filed rate doctrine continues to apply, arguing that state regulatory agencies have the power to set prospective rates abnormally low to compensate customers for excessive rates in the past. *See Taffet v. Southern Co.,* 967 F.2d 1483, 1492 (11th Cir.1992) (en banc). The Eleventh Circuit reasoned that this method of repayment would be less expensive to administer than an actual damages award anyway, and that lower set rates ensure that the cost of the penalty is not home by the customers themselves.

**16.** Circuits that have considered the question have found that class actions do not prevent the application of the filed rate doctrine. *See Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17 (2d

the PSC has held the rates at issue in this case "unjust and unreasonable" and set new "reasonable" rates.[17] Arguably, this might enable the Court to avoid rate setting, a task for which it is poorly equipped.[18] It also prevents the Court from having to second-guess a regulatory body's reasonableness determination, diminishing fear that judicial action might undermine regulatory authority.

These distinctions seem noteworthy. Upon close analysis, however, the Court remains unconvinced that they are decisive. The Court has carefully studied the filed rate doctrine and its application. Ultimately, a number of fundamental concepts weigh more significantly than any factual distinctions among cases.

### B.

The Supreme Court has had numerous opportunities to overrule, modify or water down the filed rate doctrine. On those occasions it has reconsidered all the arguments which suggest that the doctrine was either ill-advised or is now outdated. Most striking is the Court's consistent refusal to back away from the rule. The Supreme Court has at least arguably extended the scope of the filed rate doctrine as recently as 1998. *See American Telephone and Telegraph Co. v. Central Office Telephone Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). Because the Supreme Court seems to have refused every opportunity to change or qualify the filed rate doctrine, this Court should think deeply before avoiding its application without good reason.

Searching the discussions of the filed rate doctrine, the Court finds several persuasive explanations for the Supreme Court's reluctance to alter it. Imposing legal liability for a rate which the regulatory authority has authorized seems inherently unfair. *Keogh* puts this unfairness in a logical context. An antitrust injury implies the violation of a legal right. *Keogh* at 163, 43 S.Ct. 47. Unless and until a utility rate is set aside or revised, the rate remains for all purposes, the legal rate. It is a rate which those governed by it are entitled, even required, to charge. This is true whether the regulating agency conducted 10 days of hearings or approved a requested rate routinely.[19] The regulatory tariff establishes the lawfulness of the rate. *Square D* at 416–417, 106 S.Ct. 1922.

In our case, by approving the rates, the regulatory bodies bound the Telephone Companies, forbidding them from charging more or less. The heart of the filed rate doctrine is not that the rate mirrors a competitive market, nor that the rate is reasonable or thoroughly researched, it is that the filed rate is the only *legal* rate. The recipients of inmate calls could have avoided any injustice by protesting the telephone rates at the time they were filed.

---

Cir.1994); *Marcus v. AT & T Corp.*, 138 F.3d 46 (2d Cir.1998); and *H.J., Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485 (8th Cir.1992).

**17.** The Eighth Circuit was not persuaded that this neutralized the filed rate doctrine. In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485 (8th Cir.1992), customers brought a RICO (Racketeer Influenced and Corrupt Organizations) claim against the telephone company for having bribed the Public Utility Commission to approve its rates. While the case was pending, a new commission reconsidered the rates and lowered them. The Commission lacked authority to order refunds. Nevertheless, citing the filed rate doctrine, the Eighth Circuit dismissed the customer's RICO claims. *H.J.* is different from our case, however, in that the plaintiffs

received a state court settlement of $ 32 million.

**18.** However this does not lessen the difficulty or impossibility of determining the appropriate competitive rate in an admittedly regulated market.

**19.** Plaintiffs argue that the Telephone Companies rates were never subjected to meaningful agency review. The Court will assume this to be true. Even so, the filed rate doctrine retains a sound basis. It applies to all duly submitted, lawful rates regardless of the extent of the regulatory agency's inquiry into the appropriateness of those rates. *See Square D*, 476 U.S. at 417, 417 n. 19, 106 S.Ct. 1922 (dismissing as unimportant the lack of formal hearing prior to rate approval).

This way, Plaintiffs could have changed the legal rate before having to pay any "unreasonable" rates. Plaintiffs cannot, however, seek redress from the legal rate itself.

Where the government regulates an industry and requires that it submit rates for approval, competition is altered in a fundamental way. Regulated rates represent a legislative value judgment that competition would hurt rather than help consumers in a given industry. It would be unfair for courts to penalize regulated companies under anti-trust laws for a lack of competition which is imposed upon them by the legislature.

 Plaintiffs seek to avoid this result by arguing that their complaint is not a rate related claim governed by the filed rate doctrine. They say that their complaint attacks a wide range of conspiratorial conduct between the Telephone Companies and Fiscal Courts and that the rates charged are only one aspect of that claim. This is a clever, yet ultimately disingenuous argument. Plaintiffs claims revolve around the rates charged. Their antitrust claim revolves around the rates charged by the Telephone Companies. As recipients of inmate calls, Plaintiffs only have standing to challenge the price that they pay for those calls. Moreover, the commissioned exclusive supplier contracts could not be anti-competitive unless they caused excessive rates or otherwise restricted competition.[20] Plaintiffs 1983 claim attacks Defendants for charging the recipients of inmate collect calls more than the recipient of non-inmate collect calls. At bottom, this is a rate discrimination claim.

While others have made sound policy arguments against the filed rate doctrine, the Supreme Court seems determined to maintain it. Its reasons for doing so apply broadly to this case even though our facts differ in the particulars from other cases applying the doctrine. So long as the Supreme Court gives no indication of diluting

the filed rate doctrine, this Court should not do so on its own. *See also Pinney Dock and Transport Co. v. Penn. Central Corp.*, 838 F.2d 1445 (6th Cir.1988) (refusing to limit the filed rate doctrine). The Supreme Court has avoided drawing fine legal distinctions which limit the filed rate doctrine. This Court will follow that example.

Recognizing the application of the filed rate doctrine to this case has several ramifications. All Plaintiffs' damages claims under the Sherman Act and Section 1983 are dismissed. Plaintiffs may, however, still be entitled to some form of injunctive relief. *See Square D*, 476 U.S. at 422, 422 n. 28, 106 S.Ct. 1922. While the *Keogh* doctrine forecloses an injunction against enforcing a particular tariff, it does not bar injunctive relief from the underlying conspiracy. *See Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 453–55, 89 L.Ed. 1051, 65 S.Ct. 716 (1945). If Plaintiffs continue to pursue their anti-trust claims, they may be entitled to an injunction against the Fiscal Court's commissioned exclusive provider contracts, but they cannot be granted an injunction lowering the rates charged.

### III.

While injunctive relief for Plaintiffs' Equal Protection claim might be permissible under the filed rate doctrine, the Court dismisses that claim in its entirety on other grounds. Plaintiffs allege that Defendants treat the recipients of inmate initiated collect calls differently than recipients of non-inmate collect calls. While those raising the equal protection claims are the recipients of inmate calls, the reason for their different treatment arises from a policy directed at another group, the inmates.

 To state a 42 U.S.C. § 1983 claim based on a violation of the Equal Protection clause, Plaintiffs must establish that the state discriminated against similarly situated parties without a rationally relat-

---

20. To the extent that Plaintiffs attack the restrictions on service rather than the cost, this effort fails. Jails have the authority to govern how and when inmates will use the phones as long as these restrictions do not interfere with other constitutional rights.

ed legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Washington v. Reno*, 35 F.3d 1093 (6th Cir.1994). To prove state action, the private conduct of the Telephone Companies must so closely connected to that of the state that it may be treated as conduct of the state itself. *Jackson v. Metropolitan Edison, Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Plaintiffs attempt to meet this requirement by demonstrating that the state has a symbiotic relationship with the Telephone Companies. Plaintiffs point out that jails contract with Telephone Companies to provide the inmates' service. The Telephone Companies visit the jails to install and maintain the telephone equipment, and they pay the Fiscal Courts a commission based on the inmate calls. The telephone service provided must conform to guidelines, regulations and restrictions stipulated by the Fiscal Court.

■■■ While the relationship Plaintiffs describe arguably establishes that the Telephone Companies' treatment of inmates can be considered state action, it does not prove that their treatment of non-inmates is in any way fairly attributable to the state. To violate the Equal Protection Clause the state must treat two groups of similarly situated people differently. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In this case, the state's conduct only affects one group of people, namely inmates, all of whom are treated in the same manner. The Fiscal Courts have no influence over non-inmate rates.

Even if Plaintiffs could establish state sponsored discrimination, their Equal Pro-

tection claim would fail. Plaintiffs argue that the recipients of inmate calls are similarly situated to the recipients of non-inmate calls. The Court finds this a questionable proposition. Because inmates initiate the calls, the recipients are necessarily constrained by whatever security measures are appropriate to place on the inmates themselves. The connection between the inmates and the recipients of their calls cannot be severed. It is the relationship to inmates alone that defines the group. If security precautions affect the telephone services that are available to inmates, this will inevitably impact the inmate call recipients. Thus, the real question is whether inmates and non-inmates are similarly situated. This Court finds that they are not.[21] *See Hrbek v. Farrier*, 787 F.2d 414, 417 (8th Cir.1986) (holding that inmates are not similarly situated to non-inmates). Because the recipients of inmate calls are not similarly situated with the recipients of non-inmate calls, Plaintiffs would have to allege that they were discriminated against as compared to other recipients of inmate calls to state a supportable claim. They have not done so.[22]

## IV.

Finally, the Court turns to Plaintiffs' antitrust claim, which remains only for injunctive purposes. Plaintiffs assert that Defendants' commissioned, exclusive provider contracts violate the Sherman Act (15 U.S.C. § 1). Plaintiffs argue that these exclusive agreements allow Telephone Companies unfettered power to control the rates charged to those who accepted inmate collect phone calls.[23] Plaintiffs

---

**21.** Incidentally, it is probably not in the Plaintiffs' interest to argue that the recipients of inmate initiated calls should be treated the same way as the recipients of non-inmate initiated calls since the PSC's July 1, 1999 order capped the surcharge on inmate initiated calls at $ 1.50 per call, far below the non-inmate surcharge.

**22.** Because the Court is dismissing Plaintiffs' § 1983 claim, the Court sees no need to ad-

dress Defendant's Johnson Act arguments at this time.

**23.** In order to prove an anti-trust violation under 15 U.S.C. § 1, Plaintiffs must establish: (1) a contract, combination or conspiracy among two or more separate entities, that (2) unreasonably restrains trade, and (3) affects interstate commerce or foreign commerce.

state that the Fiscal Courts grant the exclusive contracts primarily to enhance their own revenues from Telephone Company commissions. By awarding contracts based on the highest commission, the Fiscal Courts all but require the Telephone Companies to take advantage of their market power to charge rates far in excess of the rates that would prevail in a competitive market.[24] The exclusive contracts, Plaintiffs contend, perform no other legitimate or necessary purpose. According to Plaintiffs, the culminating consequence of the exclusive contracts is anti-competitive: the prices charged for inmate initiated calls are "unjust and unreasonable." Even at this preliminary stage, there seems little doubt, as the PSC concluded, that some of the Telephone Company inmate calling rates were "unreasonable."

### A.

■ Plaintiffs say that these exclusive contracts are "so manifestly anti-competitive as to constitute *per se* restraints of trade under the Sherman Act." The Court finds no case law to support this position, however. The Supreme Court has limited *per se* analysis to restraints that predictably have a pernicious anti-competitive effect. *See State Oil v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 276, 139 L.Ed.2d 199 (1997). This predictability arises after a history of cases involving the challenged conduct have consistently found an unreasonable restraint of trade. *See Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 at 432, 110 S.Ct. 768, 107 L.Ed.2d 851, (1990).

For a number of reasons, the *per se* analysis does not apply here. Plaintiffs cannot establish that a history of cases involving commissioned exclusive provider contracts indicate a trend of Sherman Act violations. In fact, other cases have held that exclusive supply contracts are ordinarily permissible. *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring); *FTC v.*

*Indiana Fed'n of Dentists*, 476 U.S. 447 at 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Moreover, the special needs of prisons and the concerns for prison security both counsel against a rule of *per se* illegality. Restraint on trade would certainly be permissible if needed because of security concerns, and prisons across the country have opted to restrict inmates to collect calls with an exclusive carrier. These exclusive contracts, even when commissioned, do not seem inherently anti-competitive. They do not involve horizontal restraints of trade, price fixing or territorial market division. Therefore, the Court concludes that the "rule of reason" analysis governs this case.

### B.

■ Under the rule of reason approach, the Court must weigh whether the restraint on trade's pro-competitive benefits or legitimate business justifications outweigh its anti-competitive effects. *See generally Chicago Bd. of Trade v. United States*, 246 U.S. 231, 244, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Natl. Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 691–92, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Most commercial contracts restrain trade, but only unreasonable restraints violate antitrust law. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). To succeed in their Sherman Act claim, Plaintiffs must define a relevant product and geographic market, then demonstrate that Defendants used their market power to restrain trade unreasonably in that market. *See Intl. Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir.1989).

One of Defendants' primary arguments is that the contract provisions are reasonable. However, evidence as to the reasonableness of the contract provisions is undeveloped at this time. It would be

---

24. If the Telephone Companies had not charged inflated rates, they would not have been able to provide large enough commissions to the Fiscal Courts to win the contracts.

premature to resolve a motion to dismiss on this basis.

Defendants also attack the size of Plaintiffs' geographic market.[25] Plaintiffs have to argue that each jail governed by a single contract forms its own relevant geographic area. To say the least, this is an unusual antitrust market definition. Although Defendants argue strenuously that the market is too small to allow antitrust consideration, the case which they cite, *Double D Spotting Service, Inc., v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir.1998), seems to contain language to the contrary. In *Double D*, the Eighth Circuit stated that "The geographic market is defined by considering the commercial realities faced by consumers. It includes the geographic area in which consumers can practically seek alternative sources of the product, …". (*citing Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961)). Normally, a single facility would not be large enough to comprise the entire geographic area in which consumers could reasonably obtain substitutes for a product. However, inmates are not normal consumers. They have no access to phone services other than those offered by their confinement facility.[26] Thus, they appear to meet the standard definition for an appropriate geographic market but present a market that is counterintuitive in size and composition. The Court has not found any cases in which another court has found a jail to be an appropriate antitrust market. Nevertheless, under the strict standard for a motion to dismiss, the Court is not yet certain that Plaintiffs can prove no set of facts entitling them to relief. Therefore, the Court will not dismiss Plaintiffs' antitrust claims based on the size of the geographic market at this time.

Defendants also attack Plaintiffs' ability to establish market power. Market power is the ability to raise prices above those that would be charged in a competitive market. Whatever the market may be for antitrust purposes, the exclusive provider agreements do seem to allow Defendants to inflate prices above that likely in a competitive market.[27] To support this position, Plaintiffs point out that current prices are significantly above the cost of providing the services offered, that the jails receive commissions of up to 55% on calls and that the PSC has determined that the current rates are unjust and unreasonable. In a normal market these facts, if true, would seem to establish market power.[28] However, this is not a nor-

**25.** Defendants have also argued that Plaintiffs' product and market are too ill-defined. The product, inmate initiated collect calls, appears quite certain. Plaintiffs' market is more vague. Plaintiffs claim that the geographic market is the entire United States because inmates place calls to recipients all over the country. The geographic market, however, is usually defined by the area in which consumers can be reasonably expected to seek substitute goods, not by the area possibly impacted by the anti-trust violation. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 359, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Inmates cannot seek phone service outside their jail. Thus, the appropriate geographic market for Plaintiffs' claim, if any exists, is each individual jail.

**26.** Technically, Plaintiffs consider recipients of inmate-initiated calls and not the inmates themselves the consumers. The Court does not challenge this position but rather focuses on the inmates because the inmates' options determine the recipients options. Recipients cannot place calls to inmates. Inmates must initiate collect calls to recipients.

**27.** Defendants argue that the competitive bidding process for the exclusive contracts indicates that each telephone company lacks market power. Plaintiffs counter that this commission driven "competition" only hurts the consumer by driving the price of phone calls higher.

**28.** While the fact that Defendants' conduct was monitored by the PSC may mean that Plaintiffs are incorrect that Defendants have the "unfettered ability to raise prices", monitoring rate caps does not necessarily preclude Defendants from having the ability to raise prices above those that would be charged in a competitive market. For instance, assume the maximum rate approved by the PSC is $ 2.50 for operator assisted calls. If a service provider charges $ 2.50 because of its exclusive commissioned contract over the inmates, when it would charge $ 1.25 in a competitive

mal competitive market. It is tightly regulated. Any market power to raise rates is limited by the PSC, which has recently demonstrated its ability to monitor the Telephone Companies' exercise of market power. Even after further discovery, this issue could still prove fatal to a claim for injunctive relief.

### C.

While Plaintiffs' anti-trust claim survives Defendants' motion to dismiss, the Court has deep concerns that Plaintiffs' claim can not ultimately be successful. The Fiscal Courts control the inmate environment and regulate inmate access to all goods and services. Competition in the ordinary sense does not exist. To the extent inmates are consumers, they retain only that economic choice allowed by the jail. The artificial market produced by incarceration creates circumstances in which free market competitive principles do not apply and are difficult to impose. Plaintiffs make an appealing argument that the manner in which the Fiscal Court Defendants have dealt with their inmate security concerns has been "neither fair nor justifiable." That may well be true. This Court doubts, however, that antitrust laws will ultimately prove to be the proper vehicle to redress these grievances.

market, then the provider arguably has market power.