**Robbin MIRANDA, individually and on behalf of persons similarly situated, and Suzanne Wolfe, individually and on behalf of persons similarly situated, Plaintiffs,**

v.

**State of MICHIGAN, U.S. Sprint Communications Company, GTE North, Inc., Ameritech (f/k/a Michigan Bell Telephone Company), Defendants.**

**No. 00–CV–71238–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

March 29, 2001.

D. Richard Helson, East Lansing, MI, for plaintiffs.

James Niehas, Cleveland, OH, Michael J. Reilly, Lansing, MI, Herbert C. Donovan, William A. Sankbeil, George Ashford, Detroit, MI, Leslie M. Smith, Chicago, IL, Brant M. Laue, Mark W. McGrory, Kansas City, MO, Peter Kontio, Atlanta, GA, for defendants.

## OPINION

DUGGAN, Senior District Judge.

On March 8, 2000 Plaintiffs Robbin Miranda and Suzanne Wolfe, individually and on behalf of persons similarly situated, filed this class action against the State of Michigan and Defendants U.S. Sprint Communications ("Sprint"), GTE North, Inc., now known as Verizon North, Inc. ("Verizon"), and Ameritech, alleging that the State of Michigan and the various Telephone Company Defendants [1] have colluded in entering into exclusive inmate telephone service agreements under which inmates are restricted to collect-only calls that (1) result in the recipient of such calls being charged excessive rates and surcharges and (2) prevent inmates, or the recipients of such calls, from using the carrier of their choice, in violation of Federal and State Antitrust and Telecommunications laws. This matter is currently before the Court on the following motions:

1. Ameritech and Verizon North Inc.'s Motion to Dismiss the Complaint (filed August 21, 2000);

2. Verizon North Inc.'s Motion to Dismiss the Complaint Based Upon the Filed Rate Doctrine (filed August 21, 2000); and

3. Defendant Sprint Communication Co.'s Motion to Dismiss (filed August 21, 2000).

[1] For purposes of this Opinion only, the term "Defendants" shall refer exclusively to Defendants Sprint, Verizon, and Ameritech, with Defendant State of Michigan being referred to simply as "the State."

Oral argument regarding these motions was heard on January 18, 2001.

At oral argument, this Court granted counsel for Plaintiffs' request to amend the complaint. On February 8, 2001, Plaintiffs first amended complaint was filed and, accordingly, the Defendants' motions to dismiss are now ripe for a determination. For the reasons stated below, Defendants' motions shall be granted.

### Background

This class action has been brought on behalf of the recipients of collect calls placed by inmates from correctional facilities within Michigan. Plaintiff Robbin Miranda is a Florida resident who receives frequent calls from an inmate incarcerated in Lapeer County, Michigan. Similarly, Plaintiff Suzanne Wolfe is a resident of Michigan who also receives frequent calls from an inmate incarcerated in Lapeer County, Michigan.

At the heart of this controversy is the fact that inmates at Michigan correctional facilities are prohibited from making telephone calls to persons outside the facility except by means of collect calls from telephones provided by the State through its "exclusive dealing agreements" with Defendants. (Am.Compl.¶¶ 15–16). Under the State's exclusive dealing agreements with Defendants, all inmate telephone calls originating from a geographic area assigned to one of the Defendants must be placed via that telephone company. Despite the fact that numerous alternative options may be available at substantially lower rates, neither the inmate, nor the recipient of such calls, may utilize a telephone service provider other than that provided for by the State's agreements with Defendants.

According to Plaintiffs, these exclusive dealing agreements result in "excessive surcharges and/or connection fees (a standard $3.00 'premise' fee is charged just to make a call)" that are "well in excess of charges to the public and the families and friends of inmates in other penal systems for like services." (*Id.* ¶ 19). Plaintiffs also contend that the State's exclusive dealing agreements with the Defendant Telephone Companies have "produced adverse anticompetitive effects within the market for collect telephone calls and [have] unreasonably restrained trade in interstate commerce," and infringe on their right to obtain access to the interstate common carrier of their choice, in violation of various federal and state laws. (*Id.* at ¶ 27). Among other things, Plaintiffs seek a declaration that Defendants' acts are illegal, an injunction enjoining Defendants from enforcing their agreements, an order directing Defendants to provide Plaintiffs with a method for alternative telephone service, and restitution, as well as compensatory and punitive damages.

### Discussion

Rule 12(b)(6) is designed to test whether, as a matter of law, a plaintiff is entitled to legal relief. *See Nishiyama v. Dickson County*, 814 F.2d 277, 279 (6th Cir.1987). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). When reviewing a 12(b)(6) motion, the Court must accept all factual allegations in the complaint as true. *Kerasotes Mich. Theatres, Inc. v. National Amusements*, 854 F.2d 135, 136 (6th Cir.1988), *cert. dismissed*, 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989).

In essence, Plaintiffs claims can be broken into two categories: (1) unreasonable and discriminatory rates and (2) the illegal restriction of their right to use the tele-

phone carrier of their choice. To properly assess Plaintiffs' claims, an understanding of how collect-calls are ordinarily processed is needed. As counsel for Plaintiffs explained at oral argument, ordinarily when a collect-call is placed from a particular phone, the call is processed by the telephone carrier, or company, that provides the normal day-to-day service to that phone, or in the case of payphones, to the telephone carrier or company that owns the payphone. Such calls are therefore billed at the rate determined by that particular phone's "default" telephone carrier. For example, if a person were to place a collect-call from a payphone owned by Defendant Ameritech, as its "default," the call would be billed at whatever rate Defendant Ameritech has set for such calls.

Typically, however, a caller can bypass, or "dial around," a particular phone's default telephone carrier by selecting another telephone carrier or company at the beginning of the call. This is often accomplished by using an 800 number provided by a different telephone carrier to place the call, an example being when a caller uses a 1–800–Collect or 10–10–XXX number to place the call, or some other "calling card" or "phone card" number. When a caller "dials around" the default telephone carrier, the call is then billed at the rate provided by the "dial around" telephone carrier. For example, if a person were to use a payphone owned by Defendant Ameritech, but were to "dial around" Ameritech's service by using an 800 number provided by Defendant Verizon, the call would be billed at Defendant Verizon's rate, not Defendant Ameritech's rate. In essence, a caller can therefore select a telephone carrier of choice for such calls.

The State of Michigan, however, specifically restricts inmates to collect-only calls, thereby preventing such inmates from "dialing around" the default telephone carrier

or using any form of calling or phone card. Although Plaintiffs in this case are the recipients of such calls, not the callers, Plaintiffs assert that their rights to select the carrier of their choice are being infringed because they could otherwise inform the call-initiating inmate only to use a specific carrier. For example, if Michigan inmates were not restricted to collect-only calls through Defendants, Plaintiff Miranda would be able to instruct any inmate calling her to use a specific 800–number or calling card. Plaintiffs also claim that the rates they are automatically subjected to because of the State's collect-only restrictions are unreasonable and discriminatory when compared to those charged to the general public and inmates at other facilities.

Plaintiffs assert that the manner in which the State, through its contracts with Defendants, executes its collect-only system violates various federal and state antitrust and telecommunications laws. As noted above, Defendants have filed three motions to dismiss asserting, as a matter of law, that Plaintiffs have failed to state a claim upon which relief can be granted. Each of Plaintiffs' claims shall be addressed individually.

### 1. Federal Antitrust Claims (Count I)

The Sherman Antitrust Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The Act also makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." Id. § 2. In Count I of their amended complaint, Plaintiffs assert that the State of Michigan, along with Defendants,

have contracted, combined and conspired, in restraint of trade by prohibiting Michigan inmates from using any telephone service other than the collect-only services provided by Defendants. Plaintiffs further assert that Defendants' conduct restrains trade, monopolizes the market, and produces adverse and anticompetitive market effects.

In their motions to dismiss, Defendants assert that, as a matter of law, Plaintiffs' Federal Antitrust claim is barred by the "state action doctrine." The United States Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), is generally looked upon as the genesis of the state action doctrine. In *Parker*, the Supreme Court addressed whether a California raisin marketing program that was formulated by a state commission pursuant to the California Agricultural Prorate Act to control the marketing and sale of raisins produced in California violated the Sherman Antitrust Act. In holding that the Act did not apply to the raisin marketing program, the Supreme Court noted that the program at issue "was never intended to operate by force of individual agreement or combination," but rather, "derived its authority and efficacy from the legislative command of the State," *i.e.*, the California Agricultural Prorate Act. *Id.* at 350, 63 S.Ct. at 313.

As the Supreme Court explained, the Sherman Antitrust Act was inapplicable to the marketing program because "[t]he state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.* at 352, 63 S.Ct. at 314. In reaching this conclusion, however, the Supreme Court specifically cautioned that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring their action is lawful." *Id.* at 351, 63 S.Ct. at 314. The Supreme Court also noted that the issue before it did not involve a "question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade." *Id.* at 351–52, 63 S.Ct. at 314. Because it was the state itself that created the regulation and prescribed the conditions of the marketing program, through an exercise of its legislative authority, not through agreement or combination with other private actors, the Sherman Antitrust Act did not apply. *Id.* at 352, 63 S.Ct. at 314.

■ Over the years, the Supreme Court's holding in *Parker* has generated considerable discussion regarding the nature and extent of the exemption granted by the state action doctrine, particularly in regard to whether political subdivisions and private actors may avail themselves of the exemption, as well as the state involvement necessary to establish such exemption. *See Hybud Equip. Corp. v. City of Akron*, 742 F.2d 949, 954–55 (6th Cir.1984) (discussing Supreme Court cases regarding state action doctrine). In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court announced a two-part test to be applied in instances such as those presented by the instant controversy, *i.e.*, where private parties participate in a price-fixing regime: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943 (internal quotation omitted); *see also Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 61, 105 S.Ct. 1721, 1729, 85 L.Ed.2d 36

(1985) ("In summary, we hold *Midcal*'s two-pronged test applicable to private parties' claims of state action immunity."). "Only if an anticompetitive act of a private party meets both of these requirements is it fairly attributable to the State." *Patrick v. Burget*, 486 U.S. 94, 100, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988).

As the Supreme Court later explained in *Federal Trade Commission v. Ticor Title Insurance Co.*, 504 U.S. 621, 633, 112 S.Ct. 2169, 2176–77, 119 L.Ed.2d 410 (1992):

> *Midcal* confirms that while a State may not confer antitrust immunity on private persons by that, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details. Actual state involvement, not deference to private price fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law. Immunity is conferred out of respect for ongoing regulation by the State, not out of respect for the economics of price restraint.

If *Parker* immunity did not extend to private actors, "a State would be unable to implement programs that restrain competition among private parties" as "[a] plaintiff could frustrate any such program merely by filing suit against the regulated private parties, rather than the state officials who implement the plan." *Southern Motor Carriers*, 471 U.S. at 56–57, 105 S.Ct. at 1726. Such a result would "reduce *Parker*'s holding to a formalism that would stand for little more than the proposition that Porter Brown sued the wrong parties." *Id.* at 57, 105 S.Ct. at 1726 (citing *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 616–17 n. 4, 96 S.Ct. 3110, 3130 n. 4, 49 L.Ed.2d 1141 (1976) (Stewart, J., dissenting)).

### A. Clearly Articulated and Affirmatively Expressed State Policy

■ Before a private party is entitled to the protection of the state action exemption, it must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 40, 105 S.Ct. 1713, 1717, 85 L.Ed.2d 24 (1985). The relevant inquiry is whether a clearly articulated state policy to displace competition exists. It is not necessary, however, for the state legislature to explicitly state its expectation that its regulatory scheme will have anticompetitive effects. *Town of Hallie*, 471 U.S. at 42, 105 S.Ct. at 1718. Rather, it is sufficient if the state has expressly granted an actor the authority "to take action that would foreseeably result in anticompetitive effects." *Id.* at 43, 105 S.Ct. at 1718 (citing *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978)).

In determining whether a challenged activity constitutes clearly expressed state policy, courts have traditionally looked to relevant state statutory enactments. This is so because "*Parker* immunity is available only when the challenged activity is undertaken pursuant to a clearly articulated policy of the State itself, such as a policy approved by a state legislature, or a State Supreme Court." *Southern Motor Carriers*, 471 U.S. at 63, 105 S.Ct. at 1730 (internal citations omitted).

Defendants assert that the agreements themselves clearly reflect the State of Michigan's policy that prison inmates should have limited choices when placing telephone calls. It is clear that the Michigan Department of Corrections ("DOC") imposes strict requirements for inmate telephone systems, including the specific

restriction challenged by Plaintiffs, i.e., that inmates be limited to collect-only calls. (*Id.*, Ex. 1 at 32–34). As Defendants repeatedly stress, the collect-only requirement is not a product of any anticompetitive aspirations of their own, but rather, a specific mandatory requirement imposed by the DOC.

The DOC acting alone, however, cannot immunize private anticompetitive conduct. *Parker* immunity is only available when the challenged activity is undertaken pursuant to a clearly articulated policy of the state, as evidenced by a policy approved by the legislature, or the state supreme court. *See Southern Motor Carriers*, 471 U.S. at 62–63, 105 S.Ct. at 1729–30.

Plaintiffs assert that the relevant state policy in this case is expressed by Michigan's Telecommunications Act, which was enacted in an effort to allow and encourage competition. According to Plaintiffs, based on the plain language of the Telecommunications Act, suppression of competition cannot be considered a foreseeable result.

The relevant question, however, is not whether the State of Michigan has a general policy disfavoring anticompetitive conduct, a fact which Defendants themselves do not dispute, but rather, whether, despite its general policy disfavoring anticompetitive conduct, the State of Michigan has granted the DOC the authority "to take action that would foreseeably result in anticompetitive effects." *Town of Hallie*, 471 U.S. at 43, 105 S.Ct. at 1718.

Under Michigan law, the director of the DOC is expressly vested with the authority to promulgate rules regarding the management and control of state penal institutions. *See* Mich.Comp. Laws § 791.206(1)(d). As the Supreme Court of Michigan has recognized, "[t]he Legislature gave DOC broad authority to make rules necessary to manage and control the prison system," implying "that the Legislature intended DOC to address specific issues, such as visitation rules and guidelines." *Blank v. Department of Corr.*, 462 Mich. 103, 128, 611 N.W.2d 530 (2000) (Kelly, J.) (finding that DOC policies that limited number and type of persons that could visit inmates were within DOC's authority). In this Court's opinion, in granting the DOC such broad authority to implement rules to serve its legitimate penological interests, such as maintaining prison security and preventing misuse of prison facilities, the Legislature granted the DOC authority to take action that would foreseeably result in anticompetitive effects. Therefore, the Court is satisfied that Defendants are engaging in the challenged activity pursuant to a clearly expressed state policy as required by the first prong of the *Midcal* test.

## B. Actively Supervised by State

To be entitled to state action immunity, Defendants must also establish that the challenged conduct is actively supervised by the State. As the Supreme Court has explained:

> "The active supervision requirement stems from the recognition that where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.... The requirement is designed to ensure that the state-action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies. To accomplish this purpose, the active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct.... The mere presence of some state involvement or monitoring

does not suffice.... The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests."

*Ticor*, 504 U.S. at 634, 112 S.Ct. at 2177 (quoting *Patrick*, 486 U.S. at 100–01, 108 S.Ct. at 1663).

The purpose of the active supervision inquiry, however, "is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices;" rather, the active supervision inquiry is designed "to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Id.* at 634–35, 112 S.Ct. at 2177. "The question is not how well state regulation works but whether the anticompetitive scheme is the State's own." *Id.* at 635, 112 S.Ct. at 2177. As in causation inquiries, the proper analysis under this prong asks "whether the State has played a substantial role in determining the specifics of the economic policy." *Id.*

The State has obviously played a substantial role in deciding the specifics of the collect-only requirements at issue in this case. In fact, it was the State itself that dictated the policy through its mandatory requirements. Furthermore, as the entity that is responsible for monitoring, revising, and enforcing its own requirements regarding the management and control of state penal institutions, the Court is satisfied that the State has exercised sufficient

independent judgment and control that the details of the collect-only system challenged by Plaintiffs were the result of state intervention, not simply an agreement between private parties. It is clear that the State, through the DOC, not only supervises the challenged conduct, but determines the specifics of the challenged conduct through its detailed inmate telephone services requirements.

In summary, the Court is satisfied that the challenged anticompetitive conduct in this case, *i.e.*, the DOC's collect-only requirements, were implemented pursuant to a clearly established, and state supervised, policy to displace competition in the provision of inmate telephone services. Plaintiffs' claims against Defendants under the Sherman Antitrust Act (Count I) are therefore barred by the *Parker* state action exception and shall accordingly be dismissed.

### 2. State Antitrust Claims (Count II)

■ Plaintiffs next assert that the State's conduct of prohibiting Michigan inmates from using any telephone service other than the collect-only services provided by Defendants also violates Michigan's Antitrust Reform Act. Similar to Federal law, Michigan's Antitrust Reform Act provides that any "contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." MICH.COMP. LAWS § 445.772. Michigan's Antitrust laws also prohibit the "establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices." *Id.* § 445.773.

Defendants, however, assert that they are exempt from liability under the gov-

ernment exception to Michigan's Antitrust Reform Act, which states:

> This act shall not be construed to prohibit, invalidate, or make unlawful any act or conduct of any unit of government, when the unit of government is acting in a subject matter area in which it is authorized by law to act. . . .

MICH.COMP. LAWS § 445.774(3).

The State of Michigan is undoubtedly authorized to act in the "subject matter area" of prison administration. As the Sixth Circuit has recognized, "the administration of state prisons is a matter consigned to the states as part of their sovereign power to enforce the criminal law." *In re Wilkinson*, 137 F.3d 911, 914 (6th Cir.1998) (citing *Preiser v. Rodriguez*, 411 U.S. 475,93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)) (stating that "it is difficult to imagine an activity in which a state has a stronger interest, or one that is more intricately bound up with state laws, regulations, or procedures, than the administration of its prisons"). "In the exercise of this authority, the state has the power to adopt policies it believes are best suited for managing its prisons and assuring the safety and security of those institutions." *Id.* As discussed *supra*, the State of Michigan has specifically delegated this authority to the DOC.

In response, Plaintiffs simply assert that because Defendants are not immune from federal antitrust liability under the *Parker* state action doctrine, they are similarly not immune from liability under Michigan's Antitrust Reform Act. In so doing, Plaintiffs fail to address Defendants' argument that they are exempt from liability under the government exception contained in Michigan's Act. As discussed *supra*, the Court is satisfied that Defendants are entitled to immunity under the *Parker* state action exemption. The Court is also satisfied that the administration of state correc-

tional facilities is a subject matter area in which the State of Michigan, and more specifically, the DOC, is authorized by law to act. Accordingly, the specific conduct complained of by Plaintiffs, *i.e.*, the DOC's requirement that inmates be limited to collect-only telephone services, falls within the governmental exception to Michigan's Antitrust Reform Act and therefore, Plaintiffs' claim under the Michigan Antitrust Reform Act (Count II) shall be dismissed.

### 3. Federal Telecommunications Act Claims (Count III)

Plaintiffs further assert that the State's agreements with Defendants result in unjust and unreasonable rates being charged in violation of section 201(b) of the Federal Telecommunications Act, amount to unjust and unreasonable discrimination in charges in violation of section 202(a) of the Act, and abridge their right to use the carrier of their choice under section 226 of the Act. Each of these claims shall be addressed separately.

### A. Section 201(b): Unjust and Unreasonable Rates

The Federal Telecommunications Act generally provides that all charges for telephone services "shall be just and reasonable" and that any charge "that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). Defendants do not dispute that they are prohibited from charging unjust or unreasonable rates; rather, Defendants have raised two doctrines in defense of Plaintiffs' claims, the filed rate doctrine, and the doctrine of primary jurisdiction. The Court shall address each of these doctrines separately.

Two of the Telephone Company Defendants, Defendants Verizon and Sprint, have filed motions to dismiss based upon

the "filed rate doctrine."[2] The filed rate doctrine is an outgrowth of the regulatory structure governing interstate telecommunication carriers. Under the Federal Communications Act, interstate telecommunications carriers, such as long distance carriers, must file tariffs with the Federal Communications Commission ("FCC") detailing each telephone service they provide, the charges for such services, as well as classifications, practices, and regulations affecting such charges. *See* 47 U.S.C. § 203(a); *Fax Telecomm. Inc. v. AT & T*, 138 F.3d 479, 481–82 (2d Cir. 1998). Telecommunications carriers are prohibited from providing services other than those listed in their filed tariffs, "and may not charge, demand, collect, or receive a rate other than the rate listed in the applicable tariff." *Fax Telecomm. Inc.*, 138 F.3d at 482 (citing 47 U.S.C. § 203(c)). Under this regulatory scheme, the FCC is empowered to review and reject any rates deemed unjust, unfair, or unreasonable. *Id.* (citing 47 U.S.C. § 205(a)).

"The filed rate doctrine (also referred to as the filed tariff doctrine) is the central principle of the regulatory scheme for interstate telecommunications carriers." On the one hand, the filed rate doctrine " 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.' " *Id.* (quoting *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981)). On the other hand, and more important for purposes of this suit, "[t]he filed rate doctrine bars suits against regulated utilities

grounded on the allegation that the rates charged by the utility are unreasonable." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir.1994). Simply stated, under the filed rate doctrine, "any 'filed rate'— that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Id.*

As the Second Circuit has explained, two principles emanate from the filed rate doctrine. First, the filed rate doctrine prevents carriers from discriminating between rate payers. *Fax Telecomm. Inc.*, 138 F.3d at 489. Second:

> [T]he filed rate doctrine preserv[es] the exclusive role of federal agencies in approving rates for telecommunications services that are "reasonable" by keeping courts out of the rate-making process (the "nonjusticiability strand"), a function that the federal regulatory agencies are more competent to perform. The nonjusticiability strand recognizes that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set ... rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime.

*Id.* (internal quotations and citations omitted); *see also Cincinnati Bell Tel. Co. v. Allnet Communication Serv., Inc.*, 17 F.3d 921, 924 n. 4 (6th Cir.1994). Two district courts have relied upon the filed rate doctrine in dismissing claims similar to those raised in this case.[3] *See Arsberry v. Illi-*

---

2. Defendant Ameritech has not filed a motion seeking dismissal based upon the filed rate doctrine.

3. Although some courts have intimated that the filed rate doctrine is "plainly a creature of a different time" in light of the deregulation

of the telecommunications industry and the FCC's attempt to "regulate the doctrine out of existence by excusing carriers other than AT & T from the FCA's filing requirements," this Court agrees with the Second Circuit that "[u]nless and until the Congress or the Supreme Court re-examines the doctrine, we are

*nois,* 117 F.Supp.2d 743 (N.D.Ill.2000) (holding that challenge to fairness of collect call rates from prison inmates was non-justiciable under "filed rate" and "primary jurisdiction" doctrines); *Daleure v. Kentucky,* 119 F.Supp.2d 683 (W.D.Ky. 2000) (same).

■ Defendant Sprint asserts that it filed tariffs with the FCC setting forth all of its charges, including those governing its services under the exclusive dealing agreements at issue in this case. Defendant Sprint also contends that the very contracts at issue in this case explicitly require that Defendants charge tariffed rates. As such, the Court is satisfied that Plaintiffs' claims against Defendant Sprint must be dismissed under the filed rate doctrine.

Defendant Verizon states that it continues to file tariffs with the State of Michigan that cover services offered pursuant to the exclusive dealing agreements. The filed rate doctrine has been applied equally strong to regulation by state agencies. *Wegoland Ltd.,* 27 F.3d at 20 (citing cases).

In response, Plaintiffs contend that the Michigan Public Service Commission has expressly disavowed any regulatory oversight of prison pay phone systems, referring to a December 14, 1998 letter to counsel for Plaintiffs in which Howard L. Bradshaw, Communications Engineer for the Michigan Public Service Commission, states that in 1992, the Commission determined that collect-only pay phones provided to inmates were excluded from the Commission's regulatory province and therefore, "the manner in which phone service is provided to inmates is at the discretion of the correctional facility." (Pls.' Resp. to Ameritech & Verizon's Mot. Dismiss, Ex. 1).

The Court, however, is not convinced that the Michigan Public Service Commission's disavowment of any regulatory oversight of the "manner" in which pay phone service is provided to inmates necessarily equates to a disavowment over the reasonableness of Defendant Verizon's filed rates. In this Court's opinion, the manner in which pay phone service is provided is quite a different subject matter than the rates at which such services are provided. As nothing in the letter cited by Plaintiffs specifically disavows the fact that Verizon filed its tariffs with the Michigan Public Service Commission, the Court finds Plaintiffs' argument to be unavailing. Accordingly, the Court is satisfied that Plaintiffs' claims against Defendant Verizon must be dismissed under the filed rate doctrine.

■ In any event, even if the Court were to find Plaintiffs' argument to be persuasive, the Court is nonetheless satisfied that Plaintiffs' claims regarding the reasonableness of the Telephone Company Defendants' rates fall within the primary jurisdiction of the FCC and should therefore, be dismissed as to all of the Telephone Company Defendants. As explained by the Sixth Circuit, the doctrine of primary jurisdiction is based upon the principle that:

> "[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are bound to enforce it." *Fax Telecomm. Inc.,* 138 F.3d at 491.

more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

*In re Long Distance Telecomm. Litig.*, 831 F.2d 627, 629–30 (6th Cir.1987) (quoting *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952)). " 'The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' " *Id.* at 630 (quoting *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 63–65, 77 S.Ct. 161, 165–66, 1 L.Ed.2d 126 (1956)).

The doctrine of primary jurisdiction, however, should not be confused with exhaustion. In contrast to exhaustion, which applies "where a claim is cognizable in the first instance by an administrative agency alone" and "judicial interference is withheld until the administrative process has run its course," the doctrine of primary jurisdiction is implicated where a claim that is originally cognizable in the courts "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Western Pacific*, 352 U.S. at 63–64, 77 S.Ct. at 165; *see also In re Long Distance Telecomm. Litig.*, 831 F.2d at 630 (discussing *Western Pacific* ).

█ No fixed formula exists for applying the doctrine of primary jurisdiction. Instead, a case-by-case analysis is required with the question in every case being " 'whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.' "

*Id.* at 630 (quoting *Western Pacific*, 352 U.S. at 64, 77 S.Ct. at 165). The purpose behind the doctrine has often been expressed in terms of the desirable uniformity that will result if the specialized agency is permitted to initially determine certain types of administrative questions. *Id.*

Defendants contend that the FCC has primary jurisdiction over the rates at issue in this case by virtue of 47 U.S.C. § 276, which grants the FCC the authority to promulgate regulations regarding payphone service, including the provision of inmate telephone services in correctional institutions, "in order to promote competition among payphone service providers." 47 U.S.C. § 276 specifically states that the FCC may prescribe regulations that "establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone." *Id.* § 276(a). 47 U.S.C. § 276 also provides that the FCC's regulations preempt any State requirements to the contrary. *Id.* § 276(c).

Courts have consistently held that claims of unjust and unreasonable practices under § 201(b) of the Federal Telecommunications Act fall within the primary jurisdiction of the FCC. *See, e.g., Long Distance Telecomm. Litig.*, 831 F.2d at 631; *Arsberry*, 117 F.Supp.2d at 744; *Daleure*, 119 F.Supp.2d at 688–90. As the Sixth Circuit has stated, "Section 201(b) speaks in terms of reasonableness, . . . a determination that 'Congress has placed squarely in the hands of the [FCC].' " *Id.* (quoting *Consolidated Rail Corp. v. National Assn. of Recycling Indus., Inc.*, 449 U.S. 609, 612, 101 S.Ct. 775, 777, 66 L.Ed.2d 776 (1981)).

The FCC has repeatedly exercised its authority over inmate calling services. In 1996, the FCC considered whether "billed party preference" systems or rate caps

should be required to combat the high charges billed to parties receiving collect-only calls from inmates. (*See* Defs. Ameritech & Verizon's Mot. Dismiss, Ex. 17). In addressing the higher charges often charged to such parties, the FCC noted that prisons often installed and maintained security equipment for a number of legitimate penological and governmental interests and therefore, "[g]iven that prisons would likely seek to recover the cost of any equipment employed for legitimate security reasons, [the FCC] would expect that competitive prices for inmate-only telephone calls from prisons could be higher than the rates of calls from ordinary locations." (*Id.*, Ex. 17 at 53).

Despite this expectation, the FCC did invite public comment regarding alternative remedies for the high charges associated with prison inmate telephone services. (*Id.*, Ex. 17 at 53–54, Ex. 18 at 154). Furthermore, it appears that the FCC is currently conducting an ongoing proceeding regarding inmate payphone services. (*See id.*, Ex. 22). According to Defendants, "the FCC is addressing—right now—exactly the same issues that plaintiffs have placed before this Court." (*Id.* at 15).

In response, Plaintiffs assert that the FCC does not have primary jurisdiction over their claims because their claims are primarily antitrust claims and claims based on other violations of the federal and state telecommunications acts. It is clear, however, that regardless of the nomenclature, Plaintiffs' section 201(b) claims are based upon their assertion that the rates charged to persons receiving collect-only calls from prison inmates are unjust and unreasonable, claims that have traditionally fallen within the primary jurisdiction of the FCC.

Plaintiffs also assert that the Telecommunications Act specifically authorizes claims for damages in federal court under 47 U.S.C. § 207, which provides:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

The doctrine of primary jurisdiction, however, does not preclude or extinguish Plaintiffs' claims for damages under § 207. The doctrine of primary jurisdiction only defers such claims pending the FCC's resolution of the underlying issue, *i.e.*, whether Defendants' rates are unjust and unreasonable.

Plaintiffs also assert that the FCC would have no jurisdiction over the majority of calls that form the foundation of Plaintiffs' complaint as such calls are intrastate, not interstate, calls. Plaintiffs rely on 47 U.S.C. § 152, which provides that the FCC does not have jurisdiction over certain intrastate calls. The Court, however, finds Plaintiffs' argument unpersuasive for, as noted above, 47 U.S.C. § 276 specifically grants the FCC the authority to regulate all inmate payphone services, including intrastate calls.

The Court is satisfied that Plaintiffs' claims against Defendants under § 201(b) of the Federal Telecommunications Act fall within the primary jurisdiction of the FCC and therefore, such claims shall be dismissed.[4] Accordingly, for the reasons discussed *supra*, Plaintiffs' claims

---

4. The Court notes that on at least one occasion the Sixth Circuit has stated that in gener-

al, such claims should be stayed rather than dismissed. *See In re Long Distance Tele-*

against Defendants Ameritech, Verizon, and Sprint based upon unjust and unreasonable rates shall be dismissed.

### B. Section 202(a): Unjust and Unreasonable Discrimination

■ Section 202(a) of the Federal Telecommunications Act provides that:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a).

In support of their claim of unjust and unreasonable discrimination, Plaintiffs allege merely that "the rates charged are well in excess of charges to the public and families and friends of inmates in other penal systems for like services" and that "[s]ubstantially lower charges are incurred where telephone calls are made by inmates in penal institutions which utilize other telephone systems (e.g.: the TSI II system utilized by several federal prisons can result in calls as little as $.50; inmate calls in North Carolina, which similarly limits inmates to collect calls, can cost as little as $.90)." (Am.Compl. ¶¶ 19 & 19–A).

The FCC, as well as several other courts, have recognized that the provision of telephone services to inmates constitutes an exceptional set of circumstances and therefore, such systems are not a like communication service when compared to non-inmate telephone systems. This Court agrees.

Furthermore, with respect to Plaintiffs' allegations regarding systems used by other correctional institutions, Plaintiffs fail to allege in their amended complaint that any of the Defendants are charging different rates among those inmates using their services. At most, Plaintiffs' complaint alleges merely that several federal and North Carolina institutions that also limit inmates to collect-only calls receive more favorable rates. Plaintiffs fail to allege that any of these institutions are serviced by any of the Defendants in this case. In this Court's opinion, the fact that Telephone Company A may charge less for collect-only calls from inmates than does Telephone Company B is insufficient to state a claim for discrimination under section 202(a) of the Federal Telecommunications Act. Accordingly, Plaintiffs' claims under § 202(a) of the Federal Telecommunications Act shall be dismissed for failure to state a claim.

### C. Section 226: Right to Access Carrier of Choice

■ In general, section 226 of the Federal Telecommunications Act provides that

---

comm. Litig., 831 F.2d at 629. In *Far East Conference v. United States*, 342 U.S. 570, 576–77, 72 S.Ct. 492, 495–96, 96 L.Ed. 576 (1952), however, the Supreme Court stated that in such situations, the district court may either retain the case pending the regulatory agency's action, or order dismissal, depending upon the circumstances of the particular case. The Court has already determined that Plaintiffs' other claims against these Defendants must be dismissed. Furthermore,

Plaintiffs have raised no argument in favor of staying this action over dismissal. Accordingly, the Court is satisfied that under the circumstances of this case, dismissal is appropriate. In so doing, the Court notes that such dismissal is in no way intended to affect any rights Plaintiffs may have in pursuing such claims before the FCC, or any rights that may accrue to Plaintiffs as a result of any proceeding before the FCC.

each telephone operator service must identify itself to the consumer at the beginning of the call before any charges are incurred, permit the consumer to terminate the call at no charge before the call is placed, and disclose to the consumer immediately upon request, its rates or charges for the call, etc. 47 U.S.C. § 226(b)(1). Section 226 also provides that "aggregators," *i.e.*, persons that make telephones available to the public for interstate calls using operator services, must ensure that "each of its telephones presubscribed to a provider of operator services allows the consumer to use '800' and '950' access code numbers to obtain access to the provider of operator services desired by the consumer." *Id.* §§ 226(a)(2) & (c)(1)(B). In essence, section 226 provides that neither the location owner, the telephone owner, or the telephone company subscribed to the phone, may prevent the consumer from choosing another telephone carrier for interstate operator-assisted calls.

Plaintiffs assert in their complaint that the State has failed to inform plaintiffs of, and failed to allow plaintiffs, the right to obtain access to the interstate common carrier of their choice. Plaintiffs also assert that Defendants have failed to inform Plaintiffs of their right to access the provider of operator services of their choice, and have failed to permit the use of "800" access code numbers.

In 1996, however, the FCC determined that the definition of "aggregator" within section 226 does not include inmate-only phones at correctional facilities. (*See* FCC Rep. 96–75). According to the FCC, "providing such telephones to inmates presents an 'exceptional set of circumstances' that warrant their exclusion from the definition of 'aggregators.'" (*Id.*).

The Court is satisfied that section 226 does not apply to inmate-only telephone services. Accordingly, Plaintiffs' claims premised upon section 226 of the Federal Telecommunications Act shall be dismissed.

### 4. *Michigan Telecommunications Act Claims (Count IV)*

▇▇▇ Plaintiffs also assert that Defendants have violated Michigan's Telecommunications Act by charging unjust and unreasonable rates and denying them their right to access the carrier of their choice. Plaintiffs, however, have failed to cite, either in their amended complaint or their response to Defendants' motions to dismiss, any specific provisions of Michigan's Telecommunications Act. Furthermore, Plaintiffs focused exclusively upon their federal telecommunications claims during oral argument.

In any event, the Court is satisfied that Plaintiffs' claims under Michigan's Telecommunications Act are preempted by the Federal Telecommunications Act and therefore, such claims shall be dismissed. *See* 47 U.S.C. § 276(c)–(d) (Federal regulations preempt state regulations to the contrary, including regulations regarding inmate telephone service).

### 5. *Michigan Consumer Protection Act Claims (Count V)*[5]

As their final claim, Plaintiffs assert that Defendants' conduct of charging recipients of collect-only calls from Michigan inmates prices in excess of the price at which similar services are sold violates the Michigan Consumer Protection Act, MICH.COMP. LAWS §§ 445.901–922. Plaintiffs also contend that Defendants have "entered into consumer transactions in which the consumers, plaintiffs, waived a right and bene-

---

**5.** Count V is improperly designated "Count IV" in the amended complaint.

fit provided by law, without obtaining the specific consent of the consumers to the waiver of their statutory rights." (Am. Compl.¶ 54).

Michigan's Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including, among other things, "[e]ntering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it" and "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold." MICH.COMP. LAWS §§ 445.903(a), (t), & (z).

As discussed *supra*, inmates, as well as the recipients of calls from inmates, have no right to access the carrier of their choice. Furthermore, as previously discussed, section 276 of the Federal Telecommunications Act specifically grants the FCC authority to promulgate regulations regarding payphone services, including the provision of inmate telephone services in correctional institutions. The Court is satisfied that Plaintiffs' claims under the Michigan Consumer Protection Act are preempted by the Federal Telecommunications Act and therefore, Plaintiffs' Michigan Consumer Protection Act claims shall be dismissed.[6]

### Conclusion

For the reasons stated above, Defendants' motions to dismiss shall be granted, and Plaintiffs' claims against Defendants Verizon, Ameritech, and Sprint shall be dismissed in their entirety.

An Order consistent with this Opinion shall issue forthwith.

---

**6.** Defendant Sprint also contends that Plaintiffs' claim under Michigan's Consumer Protection Act must be dismissed pursuant to the exception contained in section 4 of the Act, which excepts any "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." MICH.COMP. LAWS § 445.904(1)(A). Because the Court is satisfied that Plaintiffs' claims under the Consumer Protection Act are preempted by the Federal Telecommunications Act, or in the alternative, barred by the "filed rate doctrine," the Court finds it unnecessary to determine whether Defendant Sprint falls within such exception.